Lanier Allison **RAMER**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

**Eugene Richard CHURCH**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

**Nos. 20887, 21352.**

United States Court of Appeals
Ninth Circuit.

Feb. 6, 1968.

Rehearing Denied in No. 21352
March 25, 1968.

No. 20887:

Murray B. Peterson (argued), Oakland, Cal., for appellant.

Anthony Michael Glassman, Dennis Kinnarid, Asst. U. S. Attys., William Matthew Byrne, Jr., U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief, Criminal Division, Los Angeles, Cal., for appellee.

No. 21352:

Wied & Wied, Colin Wied (argued), San Diego, Cal., for appellant.

Edwin L. Miller, Jr., U. S. Atty., Phillip W. Johnson (argued), Asst. U. S. Atty., San Diego, Cal., for appellee.

Before CHAMBERS, BARNES, HAMLEY, HAMLIN*, JERTBERG, MERRILL, KOELSCH, BROWNING, DUNIWAY and ELY, Circuit Judges.

---

* Senior Circuit Judge Hamlin was a member of the panel to which Ramer's appeal was first submitted, and therefore participated in the hearing and decision of Ramer's case en banc ( 28 U.S.C. § 46(c)). The two appeals having been argued together, Judge Hamlin was on the bench when Church's appeal was argued. He did not, however, participate in the decision of Church's appeal; his concurrence in this opinion is limited to those portions that deal with Ramer's appeal.

DUNIWAY, Circuit Judge.

In these two cases we ordered hearings en banc to consider whether we should continue to follow our decision in Sauer v. United States, 1957, 9 Cir., 241 F.2d 640, cert. denied, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539. There, we adhered to the so-called M'Naghten rule, as extended by the so-called irresistible impulse theory, as the test of determining whether a defendant in a criminal case can be found to have been insane when he committed the criminal act, and therefore not guilty. We adhered to *Sauer* in Smith v. United States, 1965, 9 Cir., 342 F.2d 725 and in Kilpatrick v. United States, 1967, 9 Cir., 372 F.2d 93, cert. denied, 387 U.S. 922, 87 S.Ct. 2040, 18 L.Ed.2d 979. See also Maxwell v. United States, 9 Cir., 1966, 368 F.2d 735, 740–742.

For reasons that will appear, we have concluded that these are not appropriate cases in which to reconsider the views that we expressed in *Sauer,* just as the panel that decided *Maxwell* felt that it was not an appropriate vehicle for such reconsideration.

1. *The facts in Ramer's appeal.*

Ramer was convicted on two counts charging bank robbery in violation of 18 U.S.C. § 2113(a). He was tried by the court, sitting without a jury. He entered the Sunset-Echo Park Branch of the Bank of America, in Los Angeles, on November 11, 1964, approached a teller, and said "Give me all the money you have got from hundred dollar bills down." The teller said "Pardon me," and Ramer replied "You heard me. Give me all the money you have got." When the teller started to get down from the stool where she sat, he said "Don't step on it," meaning the alarm. Next, he put his hand in his pocket and raised it over the counter, saying "I am not kidding." The teller gave him some dollar bills and he said "No, not that, the 20's." The teller gave him a batch of 20 dollar bills, including

decoy money. He appeared to have been drinking, and seemed quite nervous. He walked out of the bank, got into a car, and drove off. A bank official got the license number and gave it and a description of Ramer to the police.

Ramer drove a few blocks to the 7th and Alvarado Branch of the Crocker-Citizens Bank, parked, and went in. He waited behind a customer at a teller's window and when the customer left he laid a ten dollar bill on the counter. The teller asked "Can I help you," and he replied "Give me all the tens and twenties you have." She handed him some bills, including bait money, and he walked out of the bank, got into his car, and drove away. He was nervous, but did not appear drunk.

He drove to a nearby bar, parked, and went in. Within a short time, two Los Angeles policemen, who had been given the license number of Ramer's car and his description, spotted the car. One of them entered the bar and saw Ramer, who ran to the rest room and locked it and did not respond or come out when ordered by the police, who identified themselves, to do so. Finally, a detective fired a shotgun through the door and Ramer came out with his hands up. Some of the stolen money was found in his pocket and more was found in the rest room trash can.

A policeman took Ramer to the police car, handcuffed him, "advised him of his rights to an attorney, of his right to remain silent, and also that anything he said may be used against him in further criminal proceedings," and asked where the rest of the money was. Ramer replied "I have done this before and I am not saying nothing." The officers testified that Ramer had been drinking but was coherent and not drunk.

About an hour to an hour and a half later, FBI agent Murphy, accompanied by a Los Angeles policeman, interviewed Ramer at the Police Department. Murphy's warning is set out in the margin.[1]

---

[1] " * * * we advised him that he need not furnish any information, any information that he did furnish could be used against him in a court of law. * * * That no threats were made or promises being made to him, anything that he said

They told Ramer that the money had been found on him, and he said he would talk, but first wanted to talk to his wife. He was permitted to make several calls, but did not get her, taking about 35 minutes trying. Then he described the two robberies, much as we have set them out, except that, according to his version, the conversation with the teller at the Bank of America took place at Crocker-Citizens, and vice versa. Ramer said that he had had "a couple of beers" before the robberies and a couple more afterwards. He was asked if he was drunk and replied, "No, but I feel the beer." Ramer also said that when he was in the rest room he did not hear the shot. He refused to answer some questions. Murphy testified that Ramer had been drinking, but was coherent and not drunk.

Ramer's sole defense was insanity. The testimony of Ramer's wife and mother, as well as that of three expert witnesses, clearly shows that Ramer has a history of emotional instability, and the court indicated that it was convinced that Ramer was emotionally disturbed.

Ramer's first expert, Robert Davenport, a clinical psychologist, administered certain psychological tests to Ramer in January, 1965, about two months after the offenses. These indicated mental illness and probably schizophrenia. Davenport's conclusions are quoted in the margin.[2]

Ramer's second expert, Dr. Erric Marcus, a psychiatrist, examined Ramer on January 22, 1965. He also had Davenport's report of the results of his tests. We also quote Dr. Marcus' opinion in the margin.[3]

could be used against him in a court of law, and he had a right, if he did not have an attorney, a judge would appoint him one."

2. "* * * I felt that the responses to the test material indicated that Mr. Ramer was a rather severely disturbed person who had difficulty keeping reality in constant focus, tended to overstep the bounds of reality as presented by the testing situations. He tended to show a great deal of anger and violence underneath what, to me, on the surface appeared to be a very pleasant, quiet, soft-spoken man, not one who would feel this anger inside him.

Q. Could you tell from your test and interview whether or not he was the type of individual who could lose control of his faculties, of his will?

A. Yes, I would say he was. I will qualify this—not qualify this, but add to this this comment: That when given a testing situation in which a lot depends on it and which he has quite a bit of freedom to do what he wants with these ink blots and stories, that if he can't handle these realistically, it would seem that handling other situations outside would be kind of difficult. * * *

THE COURT: In other words, the sum total of your testimony is that under emotional stress, he acts out his frustrations by sometimes using antisocial conduct.

THE WITNESS: I think this would be a possibility, but not that it would necessarily have to be this way.

THE COURT: And sometimes under emotional stress, he doesn't act out his frustrations by doing antisocial acts?

THE WITNESS: That is very possible.

THE COURT: You are not in a position to testify whether he knew or didn't know that when he was entering the bank and demanding money from a teller that he was doing something which he knew was right or wrong?

THE WITNESS: I don't believe I can say that or answer that.

THE COURT: You couldn't answer it?

THE WITNESS: I don't think I can say that he did not know right from wrong when he performed the alleged act. I would say that it is likely that under some kind of emotional stress, his ability to clearly make accurate judgments about reality was impaired and it was appropriate that he may break down."

3. "Q. And in your opinion, did Mr. Ramer know right from wrong at the time he took the money from the two banks?

A. I believe he did.

Q. And in your opinion, was he able to control his will? In other words, was he able to prevent himself from mentally doing what he did at the time he entered the two banks and took the money?

A. No, I don't think he could.

Q. In your opinion, Doctor, does Mr. Ramer generally have control of himself?

In rebuttal, the government offered two types of evidence. First, with the support of Ramer's counsel,[4] it produced three FBI agents. Each had a statement given by Ramer shortly after he had robbed a bank. Two dealt with robbing a bank in Meriden, Connecticut, on December 11, 1956. The first of these was given on that day, and in it Ramer gave a brief history of himself and a circumstantial account of the robbery. The agent said that, when he gave the statement, Ramer was normal, did not appear drunk, but said he had been drinking. The second was given on December 12, 1956. In it, Ramer gives a somewhat detailed history of himself and his prior troubles. He states that he drank a good deal on the morning of December 11, was in a hazy state of mind, and did not recall all of his activities, and particularly, that he did not recall what he did in the bank. He says that he does not know why he robbed the bank, other than that he had been drinking, had no job, and was worried about getting money for medical expenses for his three year old son. His son was with his estranged wife in North Carolina, and she had written a letter saying that money was needed for the son's medical expenses. The third agent had interviewed Ramer twice regarding his robbery of a bank in Riverside, California on June 1, 1960. The first interview was on the day of the robbery, and Ramer said that he had been in a bar drinking and did not know what he was doing in the Police Department. On June 6, 1960, however, he gave the agent a written statement, describing the robbery and his flight in detail. He also said that he had had five glasses of beer, had no job or money, and decided to pull a burglary or robbery to get some.

Second, the government presented the testimony of Dr. Carl Von Hagen, a neurologist and psychiatrist. The doctor stated in detail the information given him by Ramer.[5] We quote his opinion in the margin.[6]

A. Yes, he does, generally.

Q. But apparently there are times when he doesn't, is that correct?

A. Yes.

Q. Do you have any opinion as to what brings on this loss of control?

A. Yes, I do.

Q. What is that?

A. When circumstances pile up on him and he becomes increasingly involved in conflicts, both internal conflicts and with the environment. He gets to a position where he can't solve the problem. Then he results in some sort of an act."

Dr. Marcus also testified that his opinion would be the same if, immediately after the robberies, and after similar prior robberies, Ramer was able to give a detailed account of them. He said that Ramer told him that he could not remember what had happened. He said that Ramer was acting under a compulsion, a medical concept, which differs from an irresistible impulse, a legal term describing "some quick momentary lapse that takes place." He said that normal people also act under compulsion—usually in a law-abiding way, but that Ramer acts "compulsively in an irrational law-breaking way."

"THE COURT: In other words, it is your opinion that if he is released and again gets into a tense situation, he probably would rob a bank in a non-violent way?

THE WITNESS: If he was released and if there were no efforts made to offer him some psychiatric treatment, some rehabilitation, it is possible that when a stress comes, it would be predictable that he would do it. * * *"

4. "MR. GERSHAN: Yes, sir, I want the same evidence to come out for me."

5. "* * * in regard to his present offense, he stated that he had been arrested on November 12 on a charge of bank robbery and that he had committed two robberies on that afternoon. He stated that in neither one of them was he armed nor was there any violence and that they were not planned. He then stated that this was the third time he had done such a thing since 1955. He stated that he made no attempt to escape after any of these offenses and he has never gotten away with any money and never really understood why he committed the offenses. * * * He stated that he was never able to reconstruct them from his memory * * * [h]e built up to these outbursts, as he calls them, under several months of increasing emotional tension; and, this finally winds up with his going temporarily berserk.

6. See note 6 on page 569.

In deciding the case, the court indicated that he felt bound by our ruling in *Sauer*, supra, and that under the *Sauer* test, most of the defense evidence had no relevancy. He also said:

"I will take Dr. Von Hagen's testimony and then I would have to find the de-

These are his terms. When it is all over, he has scattered memories of what happened. * * * Asked what he remembers this time, the defendant states that every time he tries to get back into it he just gets stuck and usually he breaks down with grief when he tries and parts of his body go out of control. Asked about the several months of increasing tension, the defendant stated that the circumstances varied each time except that there was a certain type of economic instability that has been present each time. He stated that with his record he has had difficulty getting work and he doesn't have a good relationship with others. * * * On the day of the robberies, he hadn't had anything to eat for two days previously. He dropped by to see a friend who got him the introduction at the freight docks. She owns a small tavern near his home. He knows he had some beer in the tavern, but can't recall how much. This must have been around 11:00 in the morning. He doesn't recall leaving this or what time he left. He does recall just a fleeting glimpse of himself standing in the bank and it seems as though his environment would *expand to much* more than a normal size and then diminish to the point where he doesn't recall what happened next.

The first clear recall he has is sitting in the Los Angeles Police Department interrogation room, recalling raving about something to the interrogating officers. This was about 6:00 P.M. The interrogating officers read back to him a statement of what happened and asked the defendant to sign it. The defendant forgets what they told him. Ever since then, when he gets into a conversation with anyone, even here in jail—he breaks down and starts crying."

6. "His mental condition at the time of the offense was difficult to evaluate because of the lack of adequate information, since the only information I had was obtained from him. The evidence that he gave was to the effect that he had a relatively vague memory of what had taken place and this suggested the possibility that he was in a fugue state at the time. * * * A fugue state is a period of auto-

fendant guilty. * * * Not only alone, but on the testimony of the other witnesses."

And he made it clear that he did not believe Ramer's testimony and statements that he could not remember what he had done.

matic activity during which the individual does not have good control, good cortical control of his activities, or conscious control.

THE COURT: But, would a man— could a man be in a fugue state and then be able to describe with good accuracy what events took place in it? Could he describe at a later time the events that took place during a bank robbery?

THE WITNESS: No, this is the problem, you see. * * *

Q. Assuming all the things that the defendant told you to be true, do you have an opinion as to whether he was sane at the time of the bank robbery?

A. I had a sort of an uncertain opinion, your Honor, and that was that he— assuming everything he said was true— it was possible that he could have been in a fugue state. Now, there are several things about this that bothered me. * * * Now, if one assumes that his previous offenses were committed under the same type of *situation, this becomes most dif*ficult to explain because the patients do not commit the same type of offense in a subsequent fugue state. That is, if an individual is under emotional stress and develops a psychomotor seizure, he will not do the same—perform the same act each time. * * *

THE COURT: Assume that people with whom he talked shortly after the robberies of November 11, 1964, testified that he had told them in some detail what had happened, how the robberies had occurred; would that change your opinion?

THE WITNESS: Yes, it would. * * *

\* \* \* \* \*

I would think then that he was not in a fugue state at the time of the commission of the offense."

The doctor said that he had seen the statements of Ramer that were in evidence, and on that basis said:

"Well, I would believe that these reports indicate that he had a better memory of his offense than he *told* me, and my opinion would be then that he was probably not in a fugue state at the time of the commission of the offense."

He also testified that at the time of the offenses Ramer knew the difference

## 2. *The facts in Church's appeal.*

Church was tried and found guilty by a jury on two counts, and, pursuant to a waiver of jury, by the court on a fourth count, of a four-count indictment. The first two counts charged him and two others, his brother Clarence and his brother-in-law Ray, with aiding and abetting (18 U.S.C. § 2) one Louise Horne in violating 21 U.S.C. § 174, in the illegal importation and concealing and facilitating the transportation and concealment of 1½ oz. of heroin. The fourth count charged violation of 18 U.S.C. § 1407, entering the United States without surrendering the certificate described in the section. He was sentenced to five years on counts 1 and 2 and to two years on count 4, all concurrent.

On March 22, 1965, Miss Horne, Church, Clarence and Ray drove from Los Angeles to Tijuana, Mexico. The car belonged to Clarence. She drove to the border, but Church drove across. They went to the Jai Alai courts and parked. Church left, and returned with heroin in two condoms. Church and his brother tried the heroin and were dissatisfied with it. He handed one condom to Miss Horne, and told her where to put it. They went to a motel and Miss Horne, who had been holding the second condom, returned it to Church. Later, Church handed it back to her. They returned to the Jai Alai court and Church took both condoms and left. When he returned, he handed one condom to Miss Horne. She placed it in her vagina. They returned to the border and were stopped. Miss Horne was searched and the condom, containing heroin, was found. The two Churches had discussed the trip with Miss Horne the day before and told her that its purpose was to get heroin. Miss Horne was to be paid for her services. Clarence furnished the money to buy the heroin. When questioned at the border, Church gave a false name. He was lucid and appeared normal in every way. He was not under the influence of narcotics.

Church was first tried along with Clarence and Ray in August, 1965. After the trial, he was interviewed by a probation officer. The officer's notes show:

> "From the beginning of the interview, this defendant gave the impression of having a mental disorder, staring into space and refusing to answer any questions except that he was born in St. Louis, Missouri, is twenty-seven years old, and formerly lived with his wife in Los Angeles, California. * * * After repeated effort to secure routine background information, the presentence interview was terminated."

The court ordered Church examined by a psychiatrist, found him then insane, set aside his conviction, and sent him to Springfield for treatment. He was later found sane, and able to assist in his defense. The present appeal is from the judgment of conviction upon his retrial in May, 1966.

The primary defense was insanity. Dr. William D. Kinnan, a clinical psychologist, had two interviews with Church in May, 1966, and gave him two standard tests. His opinion was that Church was a schizophrenic type, then in a state of remission. However, he could become psychotic under stress difficulties in the family situation—especially where religion is concerned. In that event, he would be out of touch with reality. He did not express an opinion as to Church's sanity at the time of the offense.[7]

---

between right and wrong and was not acting under irresistible impulse. He also testified that Ramer may have been acting under some compulsion, but that he was still capable of controlling his activities. He thought that Ramer could be schizophrenic and that it could be possible for him to go in and out of a stage where "he is unable to control his will."

The bank robbery is not related significantly to compulsive behavior.

7. His opinion is as follows:
  "This is a twenty-eight-year-old male whose basic personality structure is schizophrenic. There's a manic component, meaning that he is prone to act out his particular delusions when he is schizophrenic; that the tests I administered,

Dr. George Hollinger, a psychiatrist, examined Church on April 26, 1966 and May 10, 1966. He also interviewed Church's wife and examined the records from the Springfield hospital, the record of Church's previous psychiatric examinations and Dr. Kinnan's report of his tests, which were done at Dr. Hollinger's request. Some of Dr. Hollinger's findings are set out in the margin.[8] Immed-

the interview material I gathered, and the reports given me by Dr. Hollinger are very consistent that this is a schizophrenic type of individual who is presently in a state of remission probably as a result of several months' hospitalization that he underwent. * * * A person who is schizophrenic can withdraw. If one visits a large mental hospital in a ward of schizophrenics, you will see many of them sitting in a corner facing a wall, or if there's a television set on, they'll be spread all over the room rather than sitting close to each other. They are trying to withdraw from everything.

Other schizophrenics, rather than withdrawing inward, will act on the particular ideation or their particular thoughts. * * * They will act on them and in my opinion, on the basis of the tests, this is the way this gentleman may go. * * *

Q. Your testimony is that if on March 22d of 1965 the defendant were actively schizophrenic, and based on your knowledge of his relationship with his brother and his father and the church—all of these factors could be lumped into one—based on all of these things, he could very easily be acting out a delusion with the idea of helping his brother?

A. Absolutely.

Q. If he could accomplish the purchase of heroin himself, or, in the alternative, he might even be participating, or think that he was getting some kind of help for his brother, not knowing all this was narcotics. All this would be possible, would it not?

A. Yes, it would."

8. "Mr. Church's responses, as indicated by these results, fall in three interesting areas outside, and quite significantly outside, the normal range, and one is on the so-called Pd scale, or paranoid scale, as an indication of a person's referential thinking, thinking that other people are influencing him, having to do with making life either difficult or in some way influencing his life.

He also shows a significant peak on the so-called Sc. schizophrenic scale, which indicates a high probability of having disordered thinking, or thinking of a schizophrenic type.

And he also shows another peak on the Ma or manic scale, showing a tendency to impulsivity and acting out of his impulses.

Q. I see. The manic portion of it and the schizophrenic portion—are these commonly found together in certain individuals?

A. It is often found that a person with a schizophrenic type of psychosis or thought disorder has a tendency to act out impulsively and this often does raise the manic scale.

Q. In other words, there could be types of schizophrenics who would not act out but would simply sit and do nothing.

A. That's right.

THE COURT: Is a schizophrenic who has the high manic reaction the more dangerous person than one who does not have the manic showing?

MR. WIED: I would object to that question. I think it is misleading and prejudicial.

THE COURT: Well, I'll sustain the objection to my question and instruct the jury to disregard it.

* * * * *

I would presently say that the defendant continues to suffer from basically a schizophrenic illness which is now in remission, by which I mean, it is more organized, it has been put back together in such a way that he can speak and talk and think logically. However, one still sees the underlying mental illness there as evidenced by his wandering away from topics when talking about things that are especially emotionally charged.

So I would say that he has a schizophrenic reaction in remission at the present time. * * * In my opinion, the defendant on March 22d, was not acting in a rational manner and he was acting in response to a delusional pattern of thinking in which he felt he was accomplishing goals which, in fact, had little basis in reality, but nevertheless, he followed out a poorly organized plan of action with regard to these goals, thinking firmly that this was the way to salvation for his brother and ultimately for him.

Q. Now, the information that you gleaned would indicate then that at this time he was in a stressful situation.

A. That is correct.

Q. And having at that time a basic predisposition to the disease of schizophrenia, a stressful situation would compel him to become psychotic?

A. Yes."

iately after the doctor stated his opinion, the court read to the jury the legal definition of insanity substantially as approved in *Sauer*, supra, and told the jury that it was different from the medical definition. There was no objection. The doctor was then asked whether Church was legally sane or insane on March 22, 1965. He stated that in his opinion Church was legally insane on that day. There was then the usual cross-examination, in the course of which he stated that schizophrenics have periods of remission, so that he could not know whether Church was insane on March 22, 1965. But the doctor remained persuasively positive as to his opinion and the reasons for it.

In rebuttal, the government called Dr. Allan Schrift, a psychiatrist. He examined Church on August 24, 1965. His opinion was that on August 24, 1965, Church was "legally insane" but that on March 22, 1965 Church did not have the same mental illness, and was probably "legally sane." He also diagnosed Church as schizophrenic, undifferentiated type, but not one who appeared manic or depressed.

At the conclusion of the government's case, defense counsel reminded the court that it had appointed a Dr. Robuck to examine Church in August, 1965, offered to stipulate that the report of the doctor go in evidence, and asked the court to call the doctor as the court's witness. The prosecutor insisted that he be called as a defense witness. The court pointed out that, if the defense called the doctor, he could be compensated under the Criminal Justice Act. The upshot of the colloquy between court and counsel is as follows:

"MR. WIED: I would be happy to examine him as long as it were made clear to the jury that this is the Court's impartial witness appointed by the Court, and that he is not being called as a pro-defense witness.

THE COURT: Yes, but you are mixing up two things. I appointed him to make a report. He made the report to me and I acted on that report. Now, if you want him as a witness, then, of course, you can have him as a witness and the jury can be told how he happened to make the examination that you are going to question him on, but it puts you in the position of calling him as a witness.

I still will state to the jury how he happened to be appointed, that he made a report and I acted on the report. If you want him, we'll have to get a CJ 8 out so he can get compensated.

MR. WIED: I will have to fill that out this afternoon, in addition to calling Los Angeles.

THE COURT: All right."

The doctor was not mentioned again.

As in Ramer's case, there was considerable evidence of mental instability on Church's part. He was the second son in the large family of a very rigid pentecostal minister. He was some years younger than Clarence, toward whom he felt some "hero worship." He also felt, however, that Clarence was his father's favorite. He admired his father, wanted to be loved by him, but felt rejected. He broke away from the family pattern and became a successful "rock and roll" singer. In 1962, while on tour, he had a "religious experience," became very active in his father's church, and behaved most peculiarly—going into long periods of apparently complete abstraction and religious fervor. His brother was a heroin addict and was undergoing withdrawal symptoms (which he vividly described on the witness stand [9]) on March

---

9. "Well, it's hard to explain. It's just literal hell, if you'll excuse the expression. Your muscles hurt; your back hurts. You become—you have a crisis of temperature raising and lowering. You get hot on the inside and cold on the outside, then cold on the outside and hot on the inside.

You regurgitate or vomit. You have diarrhea, and you must have this dry heave until you just can't vomit any more, and you break out with perspiration. Your mouth is dry.

You twist, you turn every muscle; sometimes you bite yourself to displace the pain. For instance, if my back were

22, 1965. The defense theory was that Church acted under compulsion in the belief that he was somehow helping Clarence.

In instructing the jury, the court gave, substantially, the *Sauer* instruction. There were no defense objections; no other definition of insanity was suggested by defense counsel.

3. *Neither case is an appropriate one in which to reconsider our holding in Sauer.*

Various possible definitions of "legal insanity" have been suggested. In Ramer's case, counsel urges the definition adopted by the Third Circuit in United States v. Currens, 1961, 290 F.2d 751, 774,

"The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated."

He suggests as an alternative the definition proposed by the American Law Institute in its Model Penal Code, § 4.01:

"Mental Disease or Defect Excluding Responsibility.

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

(2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

This is the rule adopted by the Second Circuit in United States v. Freeman, 1966, 357 F.2d 606, 622–623 and by the Seventh Circuit in United States v. Shapiro, 1967, 383 F.2d 680, both courts adopting the Model Penal Code alternative word "wrongfulness" instead of "criminality."

Ramer's counsel also calls attention to, but does not urge that we adopt, several possible variations of these tests. One is the New Hampshire rule, stated in State v. Jones, 1871, 50 N.H. 369, 398:

"If the defendant killed his wife in a manner that would be criminal and unlawful if the defendant were sane, the verdict should be 'not guilty by reason of insanity,' if the killing was the off-spring or product of mental disease in the defendant."

Another is that adopted by the District of Columbia Circuit in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 874, 45 A.L.R.2d 1430:

"It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect.

---

hurting, I would bite myself on my arm to make my arm hurt so my back will stop hurting.

Well, you want to die; really, you actually want to die. * * * At seventy-two hours you reach your maximum height. The first day you feel like you're about to die; the second day you feel twice as bad, and the third day you feel twice as bad as that, and then you'll start subsiding. I was five days in the county jail here before I was able to take anything in and stay in, and this was only fluid. I would vomit it back up in three. * * *

* * * I asked to go to the green room so I wouldn't hurt myself or some-one else.

Q. What's the green room?
A. A padded cell there.

Then after it takes you, say, a week. All this time you don't go to sleep; you stay awake except for the first part of your kicking. The first day you will doze off, then from five to the fifteenth day I stayed awake and about the fifteenth day I started to get a couple of hours sleep, and I started to eat about the fifteenth day. I was able to keep down jello, apples, oranges, things of this nature.

You could keep a little food down from the fifteenth to the thirtieth day. It was the thirtieth day that you start—

You set and wait for that sweeper to come around the court every morning. And you would be cold. I don't wish it on Rover, and he was the dog. It's a terrible thing."

We use 'disease' in the sense of a condition which is considered capable of either improving or deteriorating. We use 'defect' in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease."

We note, however, that that court has since modified the Durham rule in McDonald v. United States, 1962, 114 U.S. App.D.C. 120, 312 F.2d 847, 851. See also Washington v. United States, D.C.Cir., 1967, 390 F.2d 444, decided December 13, 1967.

A third is that recommended by the Special Commission on Insanity and Criminal Offenders, State of California, 1962:

"A person is not criminally responsible for an act if at the time of the commission of such act, as a substantial consequence of mental disorder, he did not have adequate capacity to conform his conduct to the requirements of the law which he is alleged to have violated."

A fourth is the rule in Wion v. United States, 10 Cir., 1963, 325 F.2d 420, 430:

" * * * that a person is not criminally responsible for his conduct if, at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. The jury is then to be told that, as applied to their case, the test for criminal responsibility means that before they may return a verdict of guilty, they must be convinced beyond a reasonable doubt that at the time the accused committed the unlawful act, he was mentally capable of knowing what he was doing, was mentally capable of knowing that it was wrong, and was mentally capable of controlling his conduct."

In Ramer's case, the government commends the definition appearing in the Manual of Uniform Jury Instructions in Federal Criminal Cases for the United States District Court for the Northern District of Illinois, 33 F.R.D. 529, with some modifications:

"Section 5.03 (33 F.R.D. at 560) provides in pertinent part: 'Where a defendant introduces some evidence that he had a mental disease or defect at the time of the commission of the crime charged, the prosecution must establish beyond a reasonable doubt that defendant did not have a mental disease, or that despite the mental disease he had the capacity either to know the criminality of his conduct, or to conform to the requirements of the law.'

We think this would be better phrased by dropping 'either-or' so that the concluding portion of the instruction would read: 'the prosecution must establish beyond a reasonable doubt that the defendant did not have a mental disease, or that despite the mental disease he had the capacity to know the criminality of his conduct and conform to the requirements of the law.' "

It also commends the test approved by the British Royal Commission on Capital Punishment (1953) as quoted in *Currens*, supra, 290 F.2d at 774, n. 32:

"The jury must be satisfied that, at the time of committing the act, the accused, as a result of disease of the mind (or mental deficiency) (a) did not know the nature and quality of the act or (b) did not know that it was wrong or (c) was incapable of preventing himself from committing it."

However, the government would add to either test " * * * a sentence to advise the jury that its function in evaluating an accused's total mental condition is not to determine simply whether he was mentally ill at the time of the crime, but more basically whether, because of his mental illness, he cannot jus-

tifiably be held morally responsible for his conduct." [10]

Church's counsel urges adoption of the American Law Institute Test.

In deciding Ramer's case, the trial judge made two things clear—one that he accepted the testimony of Dr. Von Hagen, and two, that he was convinced that Ramer did, in the case of each robbery, remember what happened. This means, according to Dr. Von Hagen, that Ramer was not in a fugue state when he did the prohibited acts. Since no other basis for finding Ramer insane at the time of the robberies was advanced by Dr. Von Hagen, it follows that, under any of the tests suggested, Ramer would still have been convicted. As to him, the test applied, when compared to the tests suggested, did him no harm. That is why Ramer's case is not an appropriate case for reconsideration of *Sauer*. See Maxwell v. United States, supra, 368 F.2d at 743.

In Church's case, no evidence relating to his sanity was excluded by reason of the *Sauer* formulation. The court was not asked by Church's very competent counsel to give any instruction based upon any formulation other than that in *Sauer*. On the contrary, when the court finished its instructions, counsel expressly stated that he had no objections. No attempt was made to offer medical testimony based upon one of the tests now suggested to us. Such testimony could be quite helpful in deciding whether to adopt one of those tests. One of the important factors to be considered in weighing any test is, what is its effect likely to be? What sorts of people, under what circumstances, are likely to be acquitted under the new test proposed? The importance of this question is well illustrated by the experience of the District of Columbia Circuit under *Durham*. For all of these reasons, we do not think that Church's case is a suitable one for reconsideration of *Sauer*. Rule 30, F.R.Crim. Proc. bars the right of Church to claim error based on the court's instructions. We decline to use the plain error safety valve of Rule 52(b) in this case. Cf. Herzog v. United States, 9 Cir., 1956, 235 F.2d 664, 666.

---

10. In response to a query directed to the Attorney General by the Clerk of this Court, at the request of the Court, the Attorney General, through Fred M. Vinson, Jr., Assistant Attorney General, Criminal Division, advises that, in the view of the Department of Justice, "no single semantic formulation of an insanity standard for the federal courts is essential."

"We favor any formulation which makes it clear to the jury that the underlying question is whether it would be unjust, in view of a defendant's mental condition, to hold him morally responsible for his anti-social conduct. In arriving at that judgment on the basis of a fully-developed record of psychiatric testimony, the jury should be instructed to evaluate the accused's cognition or knowledge, volition or will, and capacity for self-control. If these concepts are conveyed with clarity the exact verbal form of the instructions is relatively unimportant. * * *

"If, however, the Department were to select among existing formulations, our preference would be the standard approved by the British Royal Commission on Capital Punishment (1953), as quoted in United States v. Currens, 290 F.2d 751, 774, n. 32 (C.A.3). We would, however, add a sentence to that formulation to emphasize to the jury that its ultimate function is to pass upon an accused's moral blameworthiness. Thus modified (our additional sentence is italicized in the quotation which follows) the standard would read:

"The jury must be satisfied that, at the time of committing the act, the accused, as a result of disease of the mind (or mental deficiency *(a)* did not know the nature and quality of the act or *(b)* did not know that it was wrong or *(c)* was incapable of preventing himself from committing it. *The jury's function in evaluating these elements is not to determine merely whether the accused was mentally ill at the time of the crime, but whether, because of such mental illness, he ought not to be held morally responsible for his conduct.*"

*4. Other errors claimed in Ramer's appeal.*

### a. *Sufficiency of the evidence.*

■ Ramer contends that the prosecution failed to sustain its burden of proving his sanity at the time of the commission of the offenses. While no motion for acquittal was made, we have given consideration to the point urged and reject it. We recognize that whenever, by testimony, the question of insanity is raised, then the fact of sanity must be established by the prosecution to the satisfaction of the trier of fact, beyond a reasonable doubt. This obligation on the part of the prosecution is set forth in Davis v. United States, 1897, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750, and is followed in this Circuit. See Buatte v. United States, 9 Cir., 1964, 330 F.2d 342. The record reveals that the trial judge was fully aware that this burden was upon the prosecution. His finding that the appellant was guilty necessarily implies that the prosecution had established beyond a reasonable doubt each and every essential element of those offenses, including the sanity of Ramer. We have carefully examined the record and have no difficulty in stating that the implied findings are abundantly supported by the evidence.

### b. *The statements to the F.B.I. agent.*

■■ Ramer urges that his conviction must be reversed because of the admission into evidence of statements made by him to F.B.I. agent Murphy. No objection was made, but Ramer contends that the district court committed "plain error" in receiving the evidence. We do not agree.

Ramer relies upon Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. His trial was concluded on March 12, 1965. *Miranda* was decided June 13, 1966; it does not apply here. Johnson v. State of New Jersey, 1966, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. The warning given by the agent is set out in note 1, supra. Murphy's testimony shows that Ramer was normal, was aware of his rights, and freely and voluntarily answered the agent's questions. There was no coercion of any kind, physical or psychological. The rule announced in Escobedo v. State of Illinois, 1964, 379 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, is inapplicable to Ramer's case. See Payne v. United States, 9 Cir., 1965, 340 F.2d 748.

### c. *Due process.*

■ Ramer argues that the use of the definition approved by us in *Sauer* denied him due process. He says that if he had been tried in the Second or Third or Seventh or District of Columbia Circuit, a more liberal definition would have been used. Ergo, trial in a circuit such as the Ninth, which adheres to *Sauer*, deprives him of due process. We find it difficult to say that the use of a definition expressly approved by the Supreme Court of the United States (Davis v. United States, 1897, 165 U.S. 373, 17 S.Ct. 360) deprived Ramer of due process. Moreover, we note that the point was not raised in the trial court. Grant v. United States, 9 Cir., 1961, 291 F.2d 746, 748, cert. denied, 1962, 368 U.S. 999, 82 S.Ct. 627, 7 L.Ed.2d 537; Gajewski v. United States, 8 Cir., 1963, 321 F.2d 261, cert. denied, 1964, 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416.

*5. Other errors claimed in Church's appeal.*

### a. *Sufficiency of the evidence.*

■ Like Ramer, Church claims that the government failed to sustain its burden of proving his sanity. Our examination of the evidence leads us to a contrary result.

### b. *The court's statements to the jury.*

■ The court did not tell the jury that if Church were acquitted he would be set free. Cf. Evalt v. United States, 9 Cir., 1964, 359 F.2d 534. Counsel speculates that the jury must have thought that he would be because the court did tell the jury that, if they had a reasonable doubt as to Church's sanity at the time of the offense, they should

find him not guilty. What else could the court have said? We decline to speculate with counsel as to what the jury might have thought.

█ Counsel urges that the court's question, the objection to which the court sustained (see n. 8, supra) was unduly prejudicial. We do not find it so.

█ An additional claim of error is stated by counsel as follows:

"During direct examination of Dr. Hollinger, counsel for the Government made objection to the introduction in evidence of statements made by Appellant to the doctor. The Court overruled the objection and stated, 'They will be offered for the limited purpose of showing what information the doctor, the witness received from the defendant. They will not be considered as evidence as to what happened on March 22d. If that evidence is to be produced, *the defendant may testify,* but the defendant cannot testify through a third person as to what happened on March 22d. * * *' Rptr.Tr. p. 353 (Emphasis supplied.) Objection to the statement by the court was made later in the proceedings (see Rptr.Tr. p. 390), and an offer by the court to explain the right of a defendant not to testify was declined by counsel for the defense that such instruction would only serve to emphasize the failure of Appellant to testify. Id., at 390–392."

Counsel argues that this was an improper comment on the failure of Church to testify. We think not; it was but a shorthand way of defining hearsay. And the court gave the following instruction:

"The law does not compel a defendant to take the witness stand and testify, and no presumption of guilt may be raised and no inferences of any kind may be drawn from the failure of a defendant to testify."

c. *The court's refusal to call Dr. Robuck as its witness.*

█ The facts as to this matter are set out above. The court offered to Church's counsel the full benefit that he would have received if the court had called the doctor; it merely wanted to establish a method of compensating him. Counsel did not take advantage of the court's offer. His reasons do not appear. We find no reversible error.

The judgments are affirmed.

Ramer's application, received by the Clerk on May 3, 1967, for an Order granting permission to supplement the record on appeal in his case by including therein a written declaration made by Ramer dated April 26, 1967, is denied. The declaration was not a part of the record before the district court.

HAMLEY, Circuit Judge, with whom MERRILL and BROWNING, Circuit Judges, concur, dissenting:

My only concern in writing this dissenting opinion is with regard to the insanity defense issue.

The majority states that it is inappropriate to consider that issue in the *Ramer* case because: (1) that case was tried to the court, (2) the court stated that it accepted the testimony of Dr. Von Hagen, (3) Dr. Von Hagen expressed the opinion, in effect, that the only possible indication of lack of criminal responsibility on the part of Ramer when the act was committed was that he was in a fugue state and thus was unable to control his activities; but that, under the established circumstances, Ramer was not in a fugue state, and (4) it follows that Ramer would have been convicted under any of the suggested tests of criminal responsibility.

There are two reasons why, in my view, this rationale does not warrant refusal to deal, on the merits, with the insanity test issue in Ramer's appeal. One is that it is not clear from the record that the trial court would have accepted Dr. Von Hagen's testimony to the exclusion of that of the other medical witnesses had the court not felt bound by our ruling in Sauer v. United States, 9 Cir.,

241 F.2d 640. As the majority opinion reports, the trial court stated that he felt bound by our ruling in *Sauer*, and that, under the *Sauer* test, most of the defense evidence had no relevance.

If the trial court's adherence to the *Sauer* test was the reason it disregarded the other medical evidence as irrelevant, then the correctness of the *Sauer* test is directly in issue in the *Ramer* appeal. This is true because one of the defense experts, Dr. Erric Marcus, expressed the opinion that Ramer committed the act "under a compulsion, a medical concept," which the doctor differentiated from an irresistible impulse. See note 3 of majority opinion. Had it not been for its adherence to the *Sauer* test, with its reference to the "irresistible impulse" factor (which I will discuss below), the trial court might have accepted this testimony by Dr. Marcus. Had his testimony been accepted, the court could have found a lack of criminal responsibility under one or another of the several tests listed in the majority opinion.

The second reason why, in my view, the majority's rationale in avoiding the criminal responsibility issue in *Ramer* is inadequate, pertains to the so-called "right and wrong" element of the *Sauer* test. The trial court accepted only the medical testimony of Dr. Von Hagen, and the latter expressed the opinion that Ramer knew the difference between right and wrong. This was the formulation of the right and wrong factor approved in Sauer v. United States, 9 Cir., 241 F.2d 640, 642, following Andersen v. United States, 9 Cir., 237 F.2d 118, 127. This formulation of the "right and wrong" factor was also held, in Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750, not to be prejudicial under the facts of that case.

However, in Hotema v. United States, 186 U.S. 413, 420, 22 S.Ct. 895, 46 L.Ed. 1225, the "right and wrong" factor which was approved was not that the defendant knew the difference between right and wrong, in general or in the abstract, but that he knew that the act he was charged with committing was wrong. But, in Matheson v. United States, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631, the Supreme Court approved the same formulation of the "right and wrong" factor which had been upheld in *Davis*.

It will be noted that in several of the tests of criminal responsibility listed in the majority opinion, the "right and wrong" element is formulated in terms similar to those approved in *Hotema*. Thus, in section 4.01 of the A.L.I. Model Penal Code, the words used are " * * * to appreciate the criminality [wrongfulness] of his conduct * * *." If the latter formulation of the "right and wrong" factor is the one that ought to prevail, then Dr. Von Hagen's testimony, being limited to the general and abstract treatment of that element, did not supply the trial court with an evidentiary basis for finding that the Government had upheld its burden of proving that Ramer was criminally responsible.

Incidentally, to equate the general and abstract version of the "right and wrong" element with M'Naghten's Rule, 10 Cl. and F. 200, 210, is to perpetuate a myth which many courts, including ours, have accepted through the years. As Circuit Judge Warren E. Burger has pointed out, history shows that the M'Naghten test in 1843 replaced and supplanted the ancient "right and wrong" test. Writes Judge Burger in "Psychiatrists, Lawyers, and the Courts," 28 Federal Probation (June, 1964) 3, at 4:

"Prior to 1843 in England, a man was held responsible if at the time of his criminal acts he was able to distinguish the difference between right and wrong. This was a test which grew from the ancient ecclesiastical courts, but the M'Naghten test did away with this abstract approach and substituted a new and concrete standard largely influenced by the writings of Dr. Isaac Ray. This test was whether the defendant knew that *the particular act*

he was committing was wrong." (Emphasis in original.) [1]

The majority states that it is inappropriate to consider the insanity defense issue in the *Church* case because: (1) no evidence relating to Church's sanity was excluded by reason of the *Sauer* formulation, (2) no attempt was made to offer medical testimony based upon one of the other tests, which testimony could be quite helpful in deciding whether to adopt one of the other tests, (3) since Church's counsel did not ask the court to give any instruction based on any other formulation but, on the contrary, expressly told the court he had no objection to the instruction given, Rule 30, F.R.Crim.Proc. bars the right of Church to claim error based on the court's instructions, and the court declines to use, in this case, the plain error safety valve of Rule 52(b), F.R.Crim.Proc.

In my view, acquiescence in the *Sauer* instruction, and failure to offer evidence which would be admissible under some other test, but not *Sauer*, ought not to preclude this court, under the circumstances, from reaching the merits of the insanity defense issue in *Church*. Counsel for defendant, as well as the trial court, knew that the trial court was bound by the *Sauer* formulation, and that a request for a different instruction or the offer of evidence not admissible under *Sauer* would be an exercise in futility.

Even if defense counsel had, with possibly some risk to his client's interest, desired to lay ground work in the trial court for reconsideration of the *Sauer* test, he was confronted with the *Sauer* ruling, 241 F.2d, at 644, 652, that only the United States Supreme Court, or Congress, could change the rule in Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, followed in *Sauer*.[2]

Under these circumstances, defense counsel ought not to be foreclosed here because he did not offer evidence which would have been inadmissible under *Sauer* and because he did not request an instruction which, under *Sauer*, the trial court was dutybound to reject. With respect to the failure to request an instruction differing from *Sauer*, it should also be added that one of the counts on which Church was convicted, was tried to the court without a jury, as to which count no jury instructions were appropriate.

It is quite true, as the majority states, that Rule 30, F.R.Crim.Proc., bars the right of Church to claim error based on the court's instructions. However, I believe that, under the circumstances of this case, and in the exercise of our discretion, we should exercise our undoubted authority to use the plain error safety valve of Rule 52(b), F.R.Crim.Proc. to reach the question on the merits.

In United Brotherhood of Carpenters, etc. v. United States, 330 U.S. 395, 411–412, 67 S.Ct. 775, 784, 91 L.Ed. 973 (1946), the Supreme Court reversed for error in the charge which had not been

---

1. Judge Burger, at page 4 of his article also provides this interesting background information concerning abandonment of the abstract "right and wrong" test in the promulgation of the M'Naghten Rule:

"What really happened was that when Mr. M'Naghten was tried, medical witnesses were called and among other authorities the writings of Dr. Isaac Ray were received in evidence. Under the old pre-M'Naghten test, that is, whether M'Naghten knew the difference between right and wrong *in the abstract,* he might well have been found legally sane and therefore criminally responsible. However, the English judges decided that knowledge of the difference between right and wrong, stand-

ing alone, was an inadequate criterion of criminal responsibility. In place of this ancient test they decided that the proper question to be submitted to the jury was whether he knew the nature and quality of his act or even if he did, whether he knew that it was wrong. The shift from the old standard of abstract right and wrong to the new "radical standard, under the influence of medical opinion, so disturbed Queen Victoria and the conservative English Establishment that the case was reviewed in the House of Lords, which ultimately approved the new standard." (Emphasis in original.)

2. This aspect of the *Sauer* decision will be further discussed below.

excepted to where "the erroneous charge was on a vital phase of the case and affected the substantial rights of the defendants," although when the defendants were being tried in the district court the legal principle rendering the charge erroneous was subject to "existing uncertainty" which was settled for the first time by the Supreme Court on review of the convictions. The same situation was presented in Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); see 8 Moore's Federal Practice § 30.04, pp. 30–38.

As this court said in Herzog v. United States, 235 F.2d 664, 666 (9th Cir. 1956), Rule 30 and Rule 52(b) are complementary rather than conflicting. The former applies *to a party* and denies him a right to reversal for unassigned error in instructions. Rule 52(b), on the other hand, is a broad grant of power *to the court* to prevent a miscarriage of justice by protecting the substantial rights of the defendant despite failure of his counsel to object. "The Rule is in the nature of an anchor to the windward. It is a species of safety provision the precise scope of which was left undefined."

So, in our case, the charge in question was on a vital phase of the case and affected the substantial rights of Church. Moreover, paralleling the situation in *Brotherhood of Carpenters,* the legal principle dealt with in the instruction—the insanity test—was subject to "existing uncertainty," inasmuch as one circuit after another has been abandoning the M'Naghten irresistible impulse test, and yet the Ninth Circuit has held that it was without power to do so. I would say that we have here almost a classic example of the kind of circumstances in which, in the exercise of its discretion, the court ought to utilize the plain error rule.

Two medical experts testified in the *Church* case. One of these was Dr. William D. Kinnan. The majority states that Dr. Kinnan did not express an opinion as to Church's sanity at the time of the offense. The majority, and with good reason, does not make a similar statement concerning the testimony of the other medical expert, Dr. George Hollinger. Some of Dr. Hollinger's testimony is set out in footnote 8 of the majority opinion. In my view, his expressed opinion, if accepted by a jury, would have permitted a jury, applying the A.L.I. test and some other tests listed in the majority opinion, to find that Church, with his established insanity, should not be held criminally responsible. Such a jury finding would hardly be warranted under the *Sauer* test.

The majority cites Maxwell v. United States, 9 Cir., 368 F.2d 735, as a precedent for not reaching the merits of the insanity defense question on the appeals now before us.

In *Maxwell,* a panel of this court declined to ask for an in banc hearing to reconsider the *Sauer* test because the evidence as to insanity was extremely meager, and there was no perceivable prejudice from failure to give an instruction more in keeping with the A.L.I. formulation.[3] On the other hand, in both the *Ramer* and *Church* appeals, there was extensive medical opinion testimony, the highlights of which are set out in several footnotes in the majority opinion. I have stated above why I believe there is, in both of these appeals, a good reason to believe failure to apply the A.L.I. formulation or one of the other newly-developed tests, prejudiced these appellants.

Under these circumstances I do not believe, as the majority apparently does, that the failure of the three-judge panel in *Maxwell* to seek in banc reconsidera-

3. As we pointed out in *Maxwell,* the evidence tending to show insanity in that case was limited to a "half-hearted" opinion that Maxwell did not clearly understand the full nature and consequences of his behavior or actions at the moment the act was committed. 368 F.2d at 743.

The full extent of the medical opinion stated in *Maxwell* was this: " * * * I think it is quite feasible to consider that he did not clearly understand the full nature and consequences of his behavior or actions at that moment." 368 F.2d at 740.

tion of the *Sauer* rule, provides a precedent which should be followed by the ten judges who sat in banc in *Ramer* and *Church*. These cases were heard in banc for the express purpose of providing an opportunity to reconsider the *Sauer* test although, in calling the in banc hearing, the court of course did not bind itself to reach the merits. The parties were advised of the purpose of the in banc hearing and supplemental briefs were invited and filed.

The two cases were well briefed and well argued on records which, in my view, were adequate for consideration of the issue on the merits.[4] Indeed, it is difficult for me to visualize how a more clear-cut presentation of the issue is to be forthcoming in the future, in view of *Sauer's* rulings, binding upon trial judges and trial counsel alike, that the evidence must be relevant, and the instructions must be appropriate, under the *Sauer* test, and that even if the *Sauer* test should be replaced, this court is incapable of doing so.

But even if the majority is unwilling to consider whether some test, such as the A.L.I. definition, should be adopted, it ought at least to clarify the so-called *Sauer* test, as applied in this circuit.[5]

---

4. A panel of this court has recently undertaken, in the interest of judicial economy, to decide a fully-presented issue even though there existed some basis for avoiding decision. See de Rozario v. Commanding Officer, 9 Cir., 390 F.2d 532, decided December 21, 1967.

5. As indicated above, the abstract formulation of the "right and wrong" element of the test, adhered to in *Sauer* and other Ninth Circuit cases on the theory that it follows M'Naghten's Rule, was in fact abandoned in that rule when the latter was promulgated 124 years ago. The concrete formulation of this factor in M'Naghten's Rule is: " * * * that he did not know he was doing what was wrong." Is it not true that our court, even if unwilling to examine more recent statements of the overall criminal responsibility test, should correct this indisputable inaccuracy in describing the M'Naghten test?

M'Naghten's Rule did not contain any element recognizing that the capacity to control behavior is an important part if not the root of the problem. However, within a short time after that rule was promulgated, an element was judicially added to the test to the effect that if the accused committed the criminal act in response to and as a result of an irresistible impulse, this could also excuse him. Burger, 28 Federal Probation. June, 1964, pages 4–5. As time went on, this "irresistible impulse" formulation was broadened by some courts in such manner as to include a mental derangement which, although not manifested by an "irresistible impulse," so completely destroys the governing power of the mind that the actions of the subject are beyond his control.

This way of stating capacity to control behavior was held not prejudicial in Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360. However, in Hotema v. United States, 186 U.S. 413, 417, 420, 22 S.Ct. 895, 46 L.Ed. 1225, the Supreme Court approved an "irresistible impulse" way of stating this factor. Later, in Matheson v. United States, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631, the Supreme Court approved an instruction which expressed the capacity to control behavior element exactly as it had been expressed in Davis.

In Anderson v. United States, 9 Cir., 237 F.2d 118, 127, this court approved an instruction that referred to this element in the broad terms of Davis, and did not use the words "irresistible impulse." In Sauer v. United States, 9 Cir., 241 F.2d 640, 642, the instruction there in question was not set out in the opinion. Examination of the briefs in that case indicates that the "irresistible impulse" formulation was used in the trial court instruction. The *Sauer* court correctly stated that this formulation had been used in the instruction, but then went on to say that the instruction given in *Andersen* was "substantially identical" to that given by the *Sauer* trial court. As indicated by what has just been said, this is inaccurate, since *Andersen* did not use the "irresistible impulse" language. Moreover, neither had the Supreme Court in *Davis* or *Matheson*, approved an "irresistible impulse" language.

In *Sauer*, the court correctly pointed out that the "irresistible impulse" language has been criticized by writers insofar as it connotes only, and is limited to, spontaneous sudden feeling. The *Sauer* court went on to say:

"Such urges may be the result of long periods of brooding and reflection.

I now state briefly what I believe the court should have held if the merits had been reached.

*First*, the *Sauer* holding (241 F.2d at 644–645, 652), that only the United States Supreme Court or Congress can change the *Davis-Sauer* formulation, should be abandoned.

One other circuit has adopted the *Sauer* position. Howard v. United States, 5 Cir., 232 F.2d 274, 275. However, the four circuits which have abandoned the M'Naghten Rule have apparently found no impediment in the Supreme Court pronouncements concerning the insanity defense. See United States v. Shapiro, 7 Cir., 383 F.2d 680; United States v. Freeman, 2 Cir., 357 F.2d 606; Wion v. United States, 10 Cir., 325 F.2d 420; and Currens v. United States, 3 Cir., 290 F.2d 751. I do not include Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 because, as *Sauer* properly points out, the District of Columbia circuit has a unique status. See 241 F.2d at 644.

In *Freeman*, 357 F.2d at 613–615, and *Currens*, 290 F.2d at 768–770, the Second and Third Circuits have dealt in detail with this issue and explained, to my satisfaction, why the circuits are not precluded by *Davis*, or any other Supreme Court opinion, from adopting some other test of criminal responsibility, and why the circuits are not required to wait for Congress to act.

*Second*, the statement of the test of criminal responsibility adhered to in *Sauer*, should be abandoned in favor of the test set out in the American Law Institute Model Penal Code, section 4.01, using the alternative word "wrongfulness" instead of "criminality." The reasons why we should adopt this course are set out at length by the Second Circuit in *Freeman*, and by the Seventh Circuit in *Shapiro*.

The A.L.I. test is the result of years of study and consultations by outstanding authorities in the relevant fields of law and social sciences. While an argument can be made that minor variances in language or emphasis would improve the test, I see nothing important to be gained by starting down a side track of this kind. The trend in both federal and state courts is in the direction of the A.L.I. test, and the advantage of uniformity is a worthy end in itself, where principle need not be surrendered.

There is perhaps a feeling by some that the circuits should do nothing which might result in more acquittals on the ground of insanity until there is a federal statute such as is now in effect for the

---

Hence 'irresistible impulse' is perhaps an inept phrase, but it can be used until a better semantic handle has been created. The fact that the trial court here used that term cannot constitute prejudicial error, in light of previous cases approving it, and the entire instruction on criminal responsibility." 241 F.2d, at 650.

In view of the last part of this quoted statement, the district courts understandably continue to make use of the "irresistible impulse" formulation, and did so in the cases now before us. One effort at supplying a "better semantic handle," which the *Sauer* court had invited, was made in Maxwell v. United States, 9 Cir.,

368 F.2d 785, where we substituted "uncontrollable act." See 368 F.2d, at 741, and note 9. Some of the other tests listed in the majority opinion likewise provide better "semantic handles." Thus the A.L.I. test refers to the lack of "substantial capacity * * * to conform his conduct to the requirements of law."

It seems to me the court should now, at the very least, clarify this element of the presently-accepted Ninth Circuit test, the need for which was recognized in *Sauer* and sought to be achieved in *Maxwell*, and which would bring our court into accord with the Supreme Court's formulation in *Davis* and *Matheson*.

District of Columbia alone, providing for automatic commitment of a defendant who is acquitted on the ground of insanity. Some indication of this point of view is to be found in *Sauer*, 241 F.2d at 651–652. However, the irrelevance of this sociological consideration in deciding what is the proper test of criminal responsibility, is shown with clarity in United States v. Shapiro, 7 Cir., 383 F.2d 680, at 686–687.

*Third,* this court should hold that as to all cases except Ramer's and Church's, the acceptance for the Ninth Circuit of the A.L.I. definition shall apply prospectively only, as to trials commencing after we announce adoption of the A.L.I. test. See *Shapiro,* at 687.

*Fourth,* the Ramer and Church judgments should be reversed, and those causes should be remanded for a new trial. It should be abundantly clear from what is said above that the district courts concerned are not chargeable with the errors which should require reversal and remand.

ELY, Circuit Judge (dissenting):

I share the minority view, expressed by Judge HAMLEY, that our court should have here taken the opportunity to abandon the outdated test of *Sauer*. I keenly regret that we have not done so.

I do not now concur in the whole of my Brother HAMLEY'S dissenting opinion, for the time may come, very soon indeed, when the force of the avalanching medico-legal criticism and repudiation of our existing rule can no longer be resisted. Until that time, it would seem preferable that I express no opinion as to whether the A.L.I. test, excellent as it is, fully comports with the ideal that none should be punished for an act which he has committed solely because of a deranging mental affliction, whether disease or defect, for which he himself is not responsible.