Don WADE, Appellant,

v.

UNITED STATES of America, Appellee.

No. 22657.

United States Court of Appeals, Ninth Circuit.

March 30, 1970.

Jonathan E. Johnson (argued), of Roberts, Carmack, Brown, Johnson & Hunter, Los Angeles, Cal., for appellant.

Alan H. Friedman (argued), Asst. U. S. Atty., Wm. Matthew Byrne, U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES, HAMLEY, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, CARTER, HUFSTEDLER, WRIGHT, KILKENNY and TRASK, Circuit Judges.

ELY, Circuit Judge:

Once again we sit *en banc* to consider an appeal challenging the viability of the M'Naghten rules. As recently as 1968 we sat *en banc* in the consolidated cases of Ramer v. United States and Church v. United States, 390 F.2d 564 (9th Cir. 1968), and decided that neither of the cases contained such an appropriate record as would allow us to reach the merits of the issue of whether more modern standards for the determination of criminal responsibility should be adopted. No other Circuit except the First continues to rely on the ancient M'Naghten rules, and that Circuit has not, insofar as we can find, had the opportunity for reconsideration in the last eight years.[1]

Since the date of our *Ramer* decision, three more Circuits have rejected *M'Naghten*. Blake v. United States, 407 F.2d 908 (5th Cir. 1969) (unanimous *en banc* decision); United States v. Smith, 404 F.2d 720 (6th Cir. 1968); United States v. Chandler, 393 F.2d 920 (4th Cir. 1968) (unanimous *en banc* decision).

Here we have a case with a record different and far more complete than were those in *Ramer* and *Church*. Wade introduced evidence which disclosed a history of probable mental derangement. There was medical testimony which would have amply justified a determination that Wade was insane under the American Law Institute Penal Code formulation of criminal responsibility.[2] He requested the District Court to instruct the jury in terms of the A.L.I. test, but the court adhered, as it was obliged to do, to the M'Naghten rules. We have concluded that we should no longer stand virtually alone; therefore we hold that Wade was entitled to application of a test of criminal responsibility in terms of Model Penal Code § 4.01(1).

In this connection, the Eighth Circuit permits, but does not require, application of tests based on variations of the M'Naghten rules. The Eighth Circuit does require, however, admission of all evidence relevant to the defendant's mental capacity and a jury charge recognizing the possibility of varying gradations and types of incapacity. *See* Pope v. United States, 372 F.2d 710, 735–736, (8th Cir. 1967) (*en banc*), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed. 1317 (1968). *See* note 16, *infra*.

---

1. *See* Amador Beltran v. United States, 302 F.2d 48 (1st Cir. 1962). The court explained, "The defendant contends * * * that the M'Naghten Rule is no longer the proper test of criminal responsibility. We do not care to pass on this broad issue on a bare record. However, we commend *to the district court's attention* cases such as United States v. Currens, 3 Cir., 1961, 290 F.2d 751, and request that on the new trial, if it determines the defendant could properly distinguish between right and wrong, it nevertheless make further findings so that we may, if need be, give consideration to this matter." *Id.* at 52–53. Our research of reported decisions discloses no subsequent opinions on insanity tests by any federal court in the First Circuit.

2. Model Penal Code § 4.01 (Final Draft, 1962). We have reprinted this section in our text at page 11, *infra*.

We need not discuss the M'Naghten rules in great detail, since they have been widely treated and criticized. Excellent summaries are contained in United States v. Chandler, 393 F.2d 920, 924–925 (4th Cir. 1968); United States v. Freeman, 357 F.2d 606, 615–622 (2d Cir. 1966); United States v. Currens, 290 F.2d 751, 763–767 (3d Cir. 1961); Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 864–874 (1954); Graham v. Commonwealth, 420 S.W.2d 575 (Ky.1967); Commonwealth v. McHoul, 352 Mass. 544, 226 N.E.2d 556 (1967); Second Circuit Annual Judicial Conference, *Insanity as a Defense*, 37 F.R.D. 365 (1964). *See also*, State v. Schantz, 98 Ariz. 200, 403 P.2d 521 (1965); State v. Dhaemers, 276 Minn. 332, 150 N.W.2d 61 (1967). In *Ramer* four of the then nine judges of our court would have abolished the use of the M'Naghten rules. Ramer v. United States, *supra*, 390 F.2d at 577 (Hamley, dissenting, joined by Merrill and Browning) and at 583 (Ely, dissenting). The majority in *Ramer*, in holding that the issue of insanity was not properly raised, expressed no opinion on the continued viability of the ancient test.[3]

The weakness and dangers of applying the traditional M'Naghten criteria as the determinant of insanity are openly apparent. The M'Naghten rules fruitlessly attempt to relieve from punishment only those mentally diseased persons who have no cognitive capacity—those who are unable to know the nature and quality of their acts or that the acts were wrong. This formulation does not comport with modern medical knowledge that an individual is a mentally complex being with varying degrees of awareness.[4] It also fails to attack the problem presented in a case wherein an accused may have understood his actions but was incapable of controlling his behavior. Such a person has been allowed to remain a danger

3. Similarly, in Maxwell v. United States, 368 F.2d 735 (9th Cir. 1966), there was no evidence to raise the insanity issue. Accordingly, a challenge therein to the M'Naghten rules was inappropriate, and the court expressed no opinion on the merits of any other test of criminal responsibility. *See also* Kilpatrick v. United States, 372 F.2d 93 (9th Cir. 1967) (per curiam). Three-judge panels of this court have followed *Sauer*, note 9 *infra*, as required in the absence of *en banc* reconsideration of the holding in that case. *See, e. g.*, Johnson v. United States, 406 F.2d 1111 (9th Cir. 1969); Oliver v. United States, 396 F.2d 434 (9th Cir. 1968); Smith v. United States, 342 F.2d 725 (9th Cir. 1965).

4. The late Mr. Justice Frankfurter, as a witness before the British Royal Commission on Capital Punishment, stated:
"I do not see why the rules of law should be arrested at the state of psychological knowledge of the time when they were formulated. * * * If you find rules that are, broadly speaking, discredited by those who have to administer them, which is, I think, the real situation, certainly with us—they are honoured in the breach and not in the observance—then I think the law serves its best interests by trying to be more honest about it. * * * I think that to have rules which cannot rationally be justified except by a process of interpretation which distorts and often practically nullifies them * * * is not a desirable system. * * * They are in large measure abandoned in practice, and therefore I think the M'Naghten Rules are in large measure shams. That is a strong word, but I think the M'Naghten Rules are very difficult for conscientious people and not difficult enough for people who say, 'We'll just juggle them' * * *."

British Royal Commission on Capital Punishment 1949–1953, report, at 102 (1953). *See also* United States v. Currens, 290 F.2d 751, 765–767 (3d Cir. 1961). The *Currens* court referred to "[t]he vast absurdity of the application of the M'Naghten Rules in order to determine the sanity or insanity, the mental health or lack of it, of the defendant * * *." *Id.* at 766–767. The court also noted, "Our institutions contain many patients who are insane or mentally ill or mentally diseased and who know the difference between right and wrong. * * * The test, therefore, of knowledge of right and wrong is almost meaningless." *Id.* at 765. *See generally* J. Biggs, The Guilty Mind: Psychiatry and the Law of Homicide (1955).

to himself and to society whenever, under *M'Naghten*, he is imprisoned without being afforded such treatment as may produce rehabilitation and is later, potentially recidivistic, released.[5]

The serious shortcomings of the M'Naghten rules are not overcome by the addition of the so-called "irresistible impulse" test which has been applied in numerous jurisdictions, including ours. The use of such a combined test was held by the Supreme Court not to be prejudicial error in Davis v. United States, 160 U.S. 469, 476–477, 16 S.Ct. 353, 40 L.Ed. 499 (1895). The irresistible impulse test, however, is subject to at least two major objections. Not only is there a debate among psychiatrists whether such impulses actually exist, but also, the test is too narrow in scope. The test's language impliedly refers to sudden, explosive, fit-like actions, but more often the allegedly criminal acts of one who is unable to control his conduct follow excessive brooding and melancholy. United States v. Freeman, *supra*, 357 F.2d at 620–621, citing Wechsler, *The Criteria of Criminal Responsibility*, 22 U.Chi.L.Rev. 367, 393 (1955). *See* Maxwell v. United States, 368 F.2d 735, 741 (9th Cir. 1966). The foregoing considerations are only a few among the many that have led, in recent years, to almost universal abandonment of the M'Naghten-irresistible impulse test by the Courts of Appeals. Moreover, they are among the considerations which have lately induced widespread criticism of the test by prestigious bar and medical groups, medicolegal scholars, and state courts, including, among the latter, states wherein legislative power in the particular field has been thought to be exclusive. *See e. g.*, State v. Moeller, 50 Haw. 110, 433 P.2d 136 (1967); State v. Dhaemers, 276 Minn. 332, 150 N.W.2d 61, 66 (1967). *See also* State v. Schantz, 98 Ariz. 200, 403 P.2d 521, 528 (1965). *Compare* State v. Malumphy, 105 Ariz. 200, 461 P.2d 677 (Dec. 3, 1969).

At one time, it was suggested that our reexamination of the M'Naghten rules was foreclosed by decisions of the Supreme Court. After observing, in Sauer v. United States, 241 F.2d 640 (9th Cir.), cert. denied, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957), that "it is very doubtful that the question is an open one," we ventured a belief that the issue was foreclosed by the Supreme Court since, at the time of *Sauer*, the only Court of Appeals to escape the hegemony of the M'Naghten rules had been the District of Columbia Circuit in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954). Nevertheless, after our *Sauer* decision, one Circuit after another has rejected the M'Naghten rules and has persuasively demonstrated that the Supreme Court has never set a fixed standard of criminal responsibility. *See generally* Ramer v. United States, 390 F.2d 564, 582 (9th Cir. 1968) (Hamley, dissenting). The M'Naghten rules have to date been rejected as an exclusive test by, in addition to the District of Columbia Circuit, the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Tenth Circuits.[6] Thus the doubts

5. *See* Second Circuit Annual Judicial Conference, *Insanity as a Defense*, 37 F.R.D. 365, 396–397 (1964).

6. United States v. Freeman, 357 F.2d 606 (2d Cir. 1966); United States v. Currens, 290 F.2d 751 (3d Cir. 1961); United States v. Chandler, 393 F.2d 920 (4th Cir. 1968) (*en banc*); Blake v. United States, 407 F.2d 908 (5th Cir. 1969) (*en banc*); United States v. Smith, 404 F.2d 720 (6th Cir. 1968); United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967) (*en banc*); Pope v. United States, 372 F.2d 710 (8th Cir. 1967) (*en banc*) (M'Naght-

en permissible if other criteria satisfied), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); Wion v. United States, 325 F.2d 420 (10th Cir.) (*en banc*), cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964).

We read from *Freeman*, *supra*, 357 F.2d at 613–614:

"Despite the government's arguments to the contrary, however, we do not believe that the Supreme Court has placed its stamp of approval on M'Naghten, and we find the cases cited for this proposition to be readily and clearly

raised by *Sauer* stand alone against the subsequent avalanche of authoritative opinions. Now, agreeing with the reasoning set forth in these opinions, and in light of the acknowledged shortcomings of the M'Naghten and irresistible impulse or uncontrollable act rules, we proceed to a brief review of alternative tests of criminal responsibility.

> distinguishable. Thus, Davis v. United States (I), 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), and Davis v. United States (II), 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897), do not represent a square holding as to the sufficiency of M'Naghten. The former was concerned with the issue of burden of proof—rather than the applicable standard—while the latter primarily involved a claim that the trial court's charge was so narrow as not even to give the defendant the full benefit of M'Naghten. Neither case, in short, raised the question whether M'Naghten should be replaced or supplemented by alternative tests.
>
> "Subsequent cases are equally barren of direct challenges to M'Naghten. Hotema v. United States, 186 U.S. 413, 22 S.Ct. 895, 46 L.Ed. 1225 (1902), merely held a jury charge sufficiently broad to embrace the particular defense there asserted. Matheson v. United States, 227 U.S. 540, 33 S.Ct. 355, 57 L.Ed. 631 (1913), in which the charge strikingly foreshadowed the much later-developed *Durham* rule, turned on the fact that the instructions actually given were essentially those requested by the defendant. The remaining decisions cited by the government, finally, concern not a test to be applied in federal prosecutions, but rather the constitutional propriety under the Fourteenth Amendment's 'due process' clause of state adoptions of M'Naghten or other variations of M'Naghten. In Leland v. State of Oregon, 343 U.S. 790, 800, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302 (1952), for example, Mr. Justice Clark wrote: 'The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case, but the progress of science has not reached a point where its learning would *compel us to require the states to eliminate the right and wrong test from their criminal law.*' "

The Third Circuit in *Currens, supra* 290 F.2d at 770–771, made the following observations concerning the effect of prior

The District of Columbia Circuit, in Durham v. United States, *supra*, adopted a test not unlike that of State v. Pike, 49 N.H. 399 (1870), in which there had been the first judicial departure from the M'Naghten rules. Under the *Durham* test, a defendant could be found not guilty by reason of insanity if his act were the *product* of a *mental disease* or *defect*.

> Supreme Court cases in the area of insanity tests:
>
> "But quite aside from the foregoing there is, we think, another and a more important and more valid approach to this problem which leads us to the belief that the Supreme Court today would not apply the M'Naghten Rules in formulating a charge for a United States court. * * * Even if it be assumed, as we think it should not be, that the import of these decisions was most favorable to the M'Naghten Rules, the advance of medical science assuredly has vastly altered the background against which they must be considered. * * * Since the turn of the century great strides in the advancement of psychiatry have been made. And since the beginning of World War II the treatment and the cure of the mentally ill, the insane, has progressed at an astounding pace. * * *
>
> "We believe that the Supreme Court in view of the present state of medical knowledge, would not approve the M'Naghten Rules and would not impose them as the test to be applied today by a jury to determine the criminal responsibility of a mentally ill defendant in a trial in a federal court."

The Tenth Circuit added, unanimously *en banc*, in *Wion, supra*, 325 F.2d at 425:

> "Since criminal responsibility in Federal courts is a rule of decision, based upon common law concepts, it is always appropriate to re-examine and reappraise the rule, in the light of the considerations which prompted other Federal courts to abandon M'Naghten, for what they believe to be a more enlightened rule for determining responsibility for criminal conduct."

The Fifth Circuit, also unanimously *en banc*, in *Blake, supra*, 407 F.2d at 915, concluded that the Supreme Court has not restricted the discretion of the Courts of Appeals to fashion rules of criminal responsibility: "We treat the *Davis* test as a dictum and in no event is it a stricture on our supervisory power to adopt a new standard."

214 F.2d at 875. When we adhered to the M'Naghten rules in *Sauer*, the only alternative rule urged by Sauer was *Durham*. We rejected the *Durham* test because we had grave concern over the possibility of entangling causation problems and fundamental policy perplexities in defining the words "product of," "mental disease," and "defect." Sauer v. United States, *supra*, 241 F.2d at 646–647. The phrase "product of" was subsequently explained in Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608 (1957), to require that a relationship exist between the defect or disease and the act such that there is a reasonable inference that the act would not have been committed but for the disease or defect. The problem here is one of assumed compartmentalization of the mind, namely, that the disease or defect supposedly produces some acts but not others. If the issue of insanity is raised by a defendant and the prosecution has not then negated the existence of a mental disease or defect beyond a reasonable doubt, it would seem practically impossible for the prosecution to gain conviction by a sufficient showing that the act was not the *product* of the disease or defect. In this sense, the *product* portion of the test seems superfluous.

Another serious problem with the *Durham* rule is that there is no standard by which the jury can determine whether the defendant ought to be held responsible if medical experts have testified that the defendant's act was produced by a mental disease or defect. The problem was exposed by Judge Burger, concurring, in Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853, 857 (1961). The District of Columbia Circuit reduced the vagueness and the scope of the *Durham* rule in McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 851 (1962) *(en banc)*, wherein the

terms "mental disease or defect," for purposes of determining criminal responsibility, were defined to mean "any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." [7] Since a successful insanity defense under the new *Durham-McDonald* test must necessarily be built upon substantially affected mental capacity and substantially affected behavioral capacity, and since it appears that the prosecution cannot normally overcome the defense by showing that the act was not a "product of" the substantially affected mental and behavioral capacity, we fail to see important differences between the *Durham-McDonald* rule and the American Law Institute test expressed in Model Penal Code § 401(1) (Final Draft, 1962), discussed below and urged by Wade in this case.

We note also the test of criminal responsibility adopted by the Third Circuit in United States v. Currens, 290 F.2d 751, 774 (3d Cir. 1961): "The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated." This test is based on the behavioral component of the A.L.I. test. The phrase "to appreciate the criminality of his conduct" was purposely omitted to avoid overemphasizing cognition which, the court thought, "would rarely be significant." 290 F.2d at 774, n. 32. Since the declaration that a person is criminally responsible for his actions is a moral judgment of the community, the *Currens* formula was rejected for its omission of a cognitive standard in Wion v. United States, 325 F.2d 420 (10th Cir. 1964). Similarly, we read in United States v. Freeman, *supra*, "While we can understand that

---

7. The District of Columbia Circuit further emphasized the separation of functions of medical expert and jury in Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967). The court precluded psychiatrists from testifying "in terms of

'product,' or even 'result' or 'cause.'" The court did not, however, proscribe experts from speaking of "mental disease or defect," although part of the ultimate issue for the jury, because these terms have medical significance. *Id.* at 456.

Court's reluctance [in *Currens*] to stress the cognitive element of the personality in light of M'Naghten's emphasis on that aspect, we cannot accept its formulation; the gravamen of psychiatric objections to the M'Naghten Rules, as we have seen, was not that they looked to the cognitive feature of the personality, undeniably a significant aspect of the total man, but that they looked to this element *exclusively*." 357 F.2d at 624. We accept the proposition that one who cannot appreciate the wrongfulness of his act should not be punished as a criminal. Accordingly, we prefer, of the two formulations, the A.L.I. proposal. Conceptually the two tests may not be significantly different. If a defendant cannot appreciate the wrongfulness of his act, it seems probable that he would be acquitted under either test because such a person may inevitably go astray of the law, thus demonstrating also a lack of capacity to conform to it. Nevertheless, the function of an insanity charge is to communicate to the jury the standards under which there may be acquittal because of insanity. If those who cannot appreciate the wrongfulness or criminality of their conduct are to be acquitted, this should be clearly communicated to the jury.

Two British tests of criminal responsibility were proposed by the British Royal Commission on Capital Punishment 1949–1953, Report (1953). The first would "leave [it to] the jury to determine whether at the time of the act the accused was suffering from disease of the mind (or mental deficiency) to such a degree that he ought not to be held responsible." *Id.* at 116. Under this test, the jury is expected to meet the ultimate moral issue involved in all insanity cases, but the jury is given no guidance other than direct resort to its collective conscience. Other tests are more commendable because they set—according to the moral sense of the community—sensible legal standards to guide the jury as to factors to be considered in reaching their conclusion.

The other British test, as quoted in United States v. Currens, 290 F.2d 751, 774 n. 32 (3d Cir. 1961), reads:

"The jury must be satisfied that, at the time of committing the act, the accused, as a result of disease of the mind (or mental deficiency) (a) did not know the nature and quality of the act or (b) did not know that it was wrong or (c) was incapable of preventing himself from committing it."

The test is essentially the M'Naghten and irresistible impulse rules recast in contemporary language. The Government, when we, in *Ramer*, asked it to select among existing formulations of criminal responsibility, favored this second British test.[8] To the extent, however, that

---

8. The Government has incorporated into this case its Supplemental Brief on criminal responsibility furnished us at our request in Ramer v. United States, 390 F.2d 564 (9th Cir. 1968). In favoring the second British test, the Government urges an extra instruction to emphasize that the jury's ultimate function is not to pass on the mental health of the defendant, but to determine whether he is morally blameworthy and ought to be punished in light of his mental illness. *See id.* at 575 n.10. We agree that the mere fact that a defendant has a mental disease is not determinative of criminal responsibility but is significant only to the extent that he lacked normal powers of control and choice. None of the purposes for enforcing criminal law except isolation, which may be only temporary and without rehabilitation, are served when a mentally deranged person who lacks substantial capacity to control his conduct is punished. *See* United States v. Chandler, *supra*, 393 F.2d at 929; United States v. Freeman, *supra*, 357 F.2d at 615; United States v. Currens, *supra*, 290 F.2d at 773. We believe that the A.L.I. test adequately conveys to the jury the relevant standards necessary to make a proper moral determination.

Model Penal Code § 4.01(1), Alternative (a) (Tent. Draft No. 4, 1955), offers a half-way station between the Government's request for an added instruction on the jury's ultimate moral decision and the final draft A.L.I. test requested by Wade. This alternative test reads:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect his capacity either to appreciate the

the Government's concern may be to require total impediment of cognition or control and to avoid standards which recognize that mental disease or defect may impair a deranged person's capacity by degrees, we reject this position for reasons already stated. *See* note 4 and accompanying text, *supra*.

We turn now to the American Law Institute test, as set forth in its Model Penal Code. It reads:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms, 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

Model Penal Code § 4.01 (Final Draft, 1962). Aside from the *Durham-McDonald* and *Currens* tests, discussed above, the A.L.I. test has been approved in all of the remaining federal Circuits except ours and the First.

The differences between the M'Naghten and A.L.I. tests were aptly examined in United States v. Shapiro, *supra*, 383 F.2d at 684–685. While the M'Naghten rules refer to a "perverted and deranged condition of the mental and moral faculties," the A.L.I. test, like the *Durham-McDonald* and *Currens* tests, refers to a "mental disease or defect," a phrase deemed more meaningful to juries in light of the expert testimony which they ordinarily hear. While the M'Naghten and irresistible impulse rules contemplate, as insane, one who is totally devoid of cognitive or behavioral capacity, the A.L.I. test does not require total incapacity of either cognition or volition. Here again, the A.L.I. phraseology is more consonant with usual medical testimony than is that of the more narrow tests. The court in *Shapiro* concluded, "It is our impression that in this difficult field absolutes are not realistic, and the ALI approach is more preferable." *Id.* at 685.

In approving the A.L.I. formulation, we note that three Circuits have adopted the word "wrongfulness" (the A.L.I.'s suggested alternative) in place of "criminality" in order to exclude from the criminally responsible category those who, knowing an act to be criminal, committed it because of a delusion that the act was morally justified.[9] We likewise

---

criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law *is so substantially impaired that he cannot justly be held responsible.*" (Emphasis added.)

The Government received this test with favorable comment and stated in Appellee's Supplemental Brief at 35, Ramer v. United States, *supra*:

"For the federal courts we believe more suitable than the present formulation is alternative (2) [quoted above] * * *. This alternative was early rejected because it submitted 'the issue squarely to the jury's sense of justice' rather than confining its 'inquiry to fact.' See Comments on the Model Penal Code, Tentative Draft No. 4, p. 159 (1955). But what was found to be a fatal defect is precisely what we believe to be the touchstone of a suitable federal standard—namely, that the jury's decision should essentially be what it deems

morally 'just' in the circumstances. See Wechsler, The Criteria of Criminal Responsibility, 22 U. of Chicago L.Rev. 367, 372 (1955)."

Although we express no view on the merits of the above test, we must observe that we fail to share the Government's concern that under the present A.L.I. test, requested by Wade, mentally deranged people who are *nevertheless morally responsible* might be acquitted. Since the A.L.I. test essentially reflects the moral standards and concerns of society, it is difficult to perceive how a defendant can be "morally responsible" if he at the same time "lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." Model Penal Code § 4.01 (Final Draft, 1962).

9. United States v. Freeman, 357 F.2d 606 (2d Cir. 1966); Blake v. United States,

believe that the term "wrongfulness" is preferable.

While we approve paragraph (1) of the A.L.I. test,[10] as quoted above, we are unable to find comparable merit in paragraph (2). The drafters of the A.L.I. test apparently intended, in framing the second paragraph, to exclude certain "psychopathic personalities," from those who might otherwise be found to suffer from a "mental disease or defect." *See* Model Penal Code, Comments § 4.01, at 160 (Tent. Draft No. 4, 1955); *compare* United States v. Smith, *supra*, 404 F.2d at 727 n. 8. Noted medical authorities have responded that the second paragraph fails to achieve its purpose and fails to establish any meaningful test. *See, e. g.*, Diamond, *From M'Naghten to Currens, and Beyond*, 50 Calif.L.Rev. 189, 193–94 (1962) (A.L.I. purported definition of psychopathic personalities does not make sense and discriminates against economically poor defendants who are less likely to produce expert testimony disclosing manifestations of mental illness beyond "criminal or otherwise anti-social conduct"); Overholser, *Criminal Responsibility: A Psychia-*

*trist's Viewpoint*, 48 A.B.A.J. 527, 529–30 (1962) (no such entity as a mental "abnormality manifested only by repeated criminal or otherwise anti-social conduct"—psychopathic personalities have numerous additional symptoms). The Sixth Circuit, noting the "great dispute over the psychiatric soundness of section 4.01(2)," has expressly refused to adopt it. United States v. Smith, *supra*, 404 F.2d at 727 n. 8.

Even more important than the need to preserve the insanity defense for those who meet the test of paragraph (1) is society's need to be protected from potential recidivists. Persons who may be labeled by experts as "psychopathic" include those who are seriously ill and who are incapable of persistent, ordered living of any kind. Although these persons might be poor subjects for successful medical treatment, they should not be sent to prison for release, after some fixed period, as likely recidivists. United States v. Currens, *supra*, 290 F.2d at 762. The inclusion of § 4.01(2) in an insanity instruction should have little or no impact on the determination of the criminal responsibility of any mentally deranged

407 F.2d 908 (5th Cir. 1969) (*en banc*); United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967) (*en banc*).

10. In United States v. Chandler, 393 F.2d 920 (4th Cir. 1968) (*en banc*), the Fourth Circuit sought to avoid the imposition of rigid formulas:

"We ought not fall into the egregious error of the last century, however. Approval of any standard or form of instruction need not, and should not, freeze the language or solidify thought. In formulating specific instructions to a jury or the standards which control a court's findings, the particular circumstances of the case may not be disregarded, and the issue as framed by the testimony may require changes in the choice of words. * * * There should be room for adaptation to the exigencies of particular cases and still larger room for constructive innovation and improvement. We embrace today's advances, but we abjure any formalistic approach which might foreclose variation. We should not prescribe for invariable use a form of words which may

be less appropriate than another in the light of the testimony in a particular case and which might tend to live on long after more rational solutions have been uncovered.

"In short, while our approval of the American Law Institute's formulation is unequivocal and unreserved, we proscribe no other form of words which may appear more appropriate in a given case now or in cases generally in the future."

393 F.2d at 926–927.

While we share the spirit which moved the Fourth Circuit, through Chief Judge Haynsworth, to make its comments, we think it unnecessary expressly to adopt the quoted language. If, at some future time, we should become convinced that some new and more satisfactory test should supplant that which we herein adopt, we shall, of course, accept it. Meanwhile, we think it desirable that our opinion contain nothing permitting an interpretation inconsistent with our intention now to supply our district courts with precise guidelines.

defendant, whether psychopathic or not, since it is practically inconceivable that a mental disease or defect would, in the terms of paragraph (2), be "manifested *only* by repeated criminal or otherwise anti-social conduct." (Emphasis added.)

It would be reason enough for us to refuse to approve § 4.01(2) on the grounds that it fails to accomplish the only purpose, one of debatable value, for which it was intended, and that it would burden trial courts and juries with an extra instruction which should have little, if any, impact on any necessary factual determination. There is, however, additional cause for our concern. This is the paragraph's ambiguity. It is unclear whether § 4.01(2) would require that a defendant be considered legally sane if, although the only overt acts manifesting his disease or defect were "criminal or otherwise anti-social," there arises from his acts a reasonable inference of mental derangement either because of the nature of the acts or because of credible medical or other evidence. Since § 4.01(2) is ambiguous to us, it is reasonable to believe that an instruction incorporating the section would be equally confusing and ambiguous to jurors. Therefore, as to § 4.01(2), we adopt the position of the Sixth Circuit.

Throughout our opinion, we have considered, as paramount, the interest of the public to be protected from dangerous individuals. It is imperative that a mentally deranged offender acquitted because of insanity be immediately subject to a procedure to determine the necessity of compulsory hospitalization for as long as he remains a menace. Outside of the District of Columbia, however, a formal federal procedure for the accomplishment of these ends has been lacking. Proposals have recently been placed before Congress to provide a special plea for insanity defenses and a hearing procedure to determine, after a successful insanity defense, whether commitment to a mental institution is nec-

essary because the defendant remains a threat to society or to himself. *See* Tydings, *A Federal Verdict of Not Guilty By Reason of Insanity and a Subsequent Commitment Procedure*, 27 Md.L.Rev. 131 (1967); Note, *Federal Commitment of Defendants Found Not Guilty By Reason of Insanity—Proposed Legislation*, 52 Iowa L.Rev. 930 (1967). The need for some form of legislation to remove the vagaries and gaps from this area of federal procedure is clear. Federal law does provide, at the present time, for entrusting to state authorities any defendant who is incompetent to stand trial.[11] 18 U.S.C. § 4244. No law, however, requires the states to confine or hospitalize the released federal prisoners, nor is there any requirement that acquitted defendants be bound over to state authorities. We need not base our present, reconsidered position solely on our confidence in state authorities to safeguard the public interest when mentally deranged persons have been accused of violating federal rather than state laws. The paramount and controlling factor is that we cannot abdicate our judicial responsibility by prolonging an antiquated common law rule of criminal responsibility merely because legislation on collateral matters is still pending. Consequently, we overrule our decision in Sauer v. United States, *supra*.

Our new rule for the determination of criminal responsibility of the mentally deranged shall not operate to the advantage of those whose convictions have already become final. In Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 874 (1954), and United States v. Shapiro, 383 F.2d 680, 687 (7th Cir. 1967), it was held that the new rules should have purely prospective application so that the change affected only the appellants directly involved in the two appeals and defendants in trials commencing after the date of the decisions. Neither case, however, discussed the issue confronted by the court in United

---

11. Additionally, a convicted federal prisoner upon expiration of his sentence may be entrusted to state authorities. 18 U.S.C. §§ 4243, 4247–4248.

States v. Tarrago, 398 F.2d 621 (2d Cir. 1968) (*en banc*), wherein a slightly different result was reached. In *Tarrago,* the Second Circuit applied the policy considerations set forth by the Supreme Court in Stovall v. Denno, 388 U.S. 293, 296–297, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and decided that its adoption of the A.L.I. rule in Freeman v. United States, *supra,* should have "limited retroactivity" so as to extend the *Freeman* holding to the two cases pending on appeal at the date of the *Freeman* decision. 398 F.2d at 623–625. The Fifth and Sixth Circuits have recently followed the *Tarrago* opinion in connection with their abandonment of the M'Naghten rules. Blake v. United States, 407 F.2d 908 (5th Cir. 1969) (in banc); United States v. Smith, 404 F.2d 720 (6th Cir. 1968). *See also* Brumley v. Commonwealth, 375 S.W.2d 270 (Ky.1964). We are in agreement. Our present holding will be applied with limited retroactivity so as to affect only those defendants, in addition to Wade, whose trials have not yet begun or whose convictions have not become final as of the date of this decision.

Finally, it must be noted that Wade has presented in addition to the insanity issue, a question of great importance that has not as yet been satisfactorily answered in this or any other Circuit. This question is whether a trial court, when appointing a psychiatrist to examine the defendant pursuant to 18 U.S.C. § 4244 or pursuant to its inherent powers, may properly order that the examination cover both competency to stand trial and criminal responsibility at the time of the alleged offense. More importantly, assuming that this order is valid, the question is raised whether a court has the inherent power to order, as the District Court here did, that the defendant must cooperate and provide information to the court-appointed psychiatrist, or else be "precluded at the time of trial from offering any evidence upon the defense of insanity."

This type of order requires the defendant to supply the court-appointed psychiatrist with information on the basis of which, in part, the psychiatrist can form an opinion of the defendant's mental state at the time of the offense. If the psychiatrist is subsequently permitted to testify for the prosecution during trial, the result may be that the defendant's own words are used against him. Therefore, coerced cooperation with a psychiatrist not chosen by the accused may violate the fifth amendment privilege unless it can be justified on one or more of various theories that have been discussed by both courts and commentators. *See, e. g.,* Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695 (1969); United States v. Albright, 388 F.2d 719 (4th Cir. 1968); French v. District Ct., 153 Colo. 10, 384 P.2d 268 (1963); Danforth, *Death Knell for Pre-Trial Mental Examination? Privilege Against Self-Incrimination,* 19 Rutgers L.Rev. 489 (1965); Comment, *Compulsory Mental Examinations and the Privilege Against Self-Incrimination,* 1964 Wis.L.Rev. 671.

It is quite obvious that a grave constitutional question is presented. Could, for example, an accused against whom such an order was imposed be barred from presenting the insanity defense if he were so deranged as to be mentally incapable of extending the cooperation required by the order? Compare Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). On the other hand, a different problem would be presented had the District Court's order been more restrictive, simply barring the defendant from presenting the testimony of any medical expert to whom he himself had given a personal history unless he similarly cooperated with the expert appointed by the court. *See* United States v. Baird, 414 F.2d 700 (2d Cir. 1969). We have concluded, however, in light of our disposition of the case before us and the possibility that the question may not again arise, that we need not decide the constitutional issue on the present record.

Reversed and remanded.

TRASK, Circuit Judge, with whom CHAMBERS, BARNES, KOELSCH, JAMES M. CARTER and KILKENNY, Circuit Judges, join, dissenting.

In a burst of togetherness, the majority decides that it should no longer "stand virtually alone", but should join an "avalanche" of opinion in rejection of the M'Naghten test of criminal responsibility. It adopts the American Law Institute test instead.

The decisions of the Courts of Appeals in the other circuits which have foresworn M'Naghten lend impressive weight to this choice. The M'Naghten test has, however, been the guiding principle for determining insanity as a defense in a criminal action for more than 125 years. To withstand the test of time for such a span would alone indicate that it must possess some sturdy merit. To abandon it now means to change the established rule for federal courts in nine states and the Territory of Guam. Forty-nine divisions of the District Courts of the United States are affected having more than twenty-four millions of people within the geographical area. For this Court to judicially legislate a substantial change of such moment would seem to require not only a careful examination of what we are discarding but the consequences of the change.

The Supreme Court approved the M'Naghten rule in 1897 in Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750. It has not re-examined its position since that time, notwithstanding a plethora of conflicting decisions among the circuits.

Learned discussion of the history of the rule and the psychiatric considerations involved have been belabored in the courts of all the circuits. The medical profession has claimed its share of the debate.

The M'Naghten rule and the ALI test are set forth in the margin.[1] M'Naghten has been expanded by the Ninth Circuit to include the irresistible impulse test which has been updated by defining it in terms of "uncontrollable act". Maxwell v. United States, 368 F.2d 735, 741 (9th Cir. 1966). Each test therefore encompasses the "cognitive" capacity of the individual as well as his "volition". With the "irresistible-impulse" test phrased as "uncontrollable act", the volition portion of the test will cover not only "sudden, explosive, fit-like actions" but also uncontrollable acts resulting from excessive brooding and melancholy. Thus, the M'Naghten test in this circuit embodies not only "cognition" but also "volition" and the capacity to control be-

1. M'Naghten test from Daniel M'Naghten's Case, 8 Eng.Rep. 718 (H.L. 1843), in form approved by this circuit:
"'Insane,' as here used, means such a perverted and deranged condition of a person's mental and moral faculties as to render him either incapable of distinguishing between right and wrong, or capable of knowing the nature of the act he is committing; or where he is conscious of the nature of the act he is committing and able to distinguish between right and wrong, and knows the act is wrong, yet his will, by which I mean the governing power of his mind, has been so completely destroyed that his actions are not subject to it, but are beyond his control." Maxwell v. United States, 368 F.2d 735, 741 n. 7 (9th Cir. 1966).
The court indicated at p. 742 that, although the "uncontrollable act" portion of

the test was not clearly set forth, this was not material because no evidence had been introduced to support it. Judge Hamley (who wrote Maxwell), in his dissent in Ramer v. United States, calls attention to a departure in the quoted language from the test actually adopted by the House of Lords.
American Law Institute test:
"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.
"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

havior—a composite of the entire action pattern of man.[2]

Nor is the rule of this circuit subject to the frequently stated criticism that it unduly restricts psychiatric testimony or requires the psychiatrist to express a moral judgment. All possibly relevant evidence is admissible to reveal the most complete picture of the accused and his mind and his motivations. Sauer v. United States, 241 F.2d 640, 647, (9th Cir. 1957), cert. denied, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957). See also Pope v. United States, 372 F.2d 710, 736 (8th Cir. 1967); Wion v. United States, 325 F.2d 420, 430 (10th Cir. 1963), cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964). As to the risk of the psychiatrist having to express a moral judgment in answer to a hypothetical question framed in the terms of the particular test involved, the same objection applies to any formulation.

In short, as the M'Naghten test is defined in this circuit and as it is applied, the traditional criticisms are substantially dissipated.

Should an alternative be considered, the formulation which adopts the best of M'Naghten, modernizes its language, makes it easily understood and most nearly includes all of the elements recommended by the psychiatrists would seem to be that approved by the British Royal Commission on Capital Punishment. As stated in United States v. Currens, 290 F.2d 751, 774 n. 32 (3rd Cir. 1961) it reads as follows:

"The jury must be satisfied that, at the time of committing the act, the accused, as a result of disease of the mind (or mental deficiency) (a) did not know the nature and quality of the act or (b) did not know that it was wrong or (c) was incapable of preventing himself from committing it."

With this as a basic framework, plus leeway to adapt words to particular circumstances or testimony, a workable standard would be available for all insanity cases. See United States v. Chandler, 393 F.2d 920, 926–927 (4th Cir. 1968).

A second alternative equally comprehensive, equally simple and equally sound is that suggested by then Circuit Judge Burger in a concurring opinion in Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853 (1961):

"The defendant is not to be found guilty as charged unless it is established beyond a reasonable doubt that when he committed the act, first, that he understood and appreciated that the act was a violation of law, and second, that he had the capacity to exercise his will and to choose not to do it. If, because of some abnormal mental condition, either of these elements is lacking, he cannot be found guilty. To hold him guilty the jury must find, beyond a reasonable doubt, both that he understood and appreciated the act charged was a violation of law and that he possessed the capacity or competence to choose to do it or refrain from doing it." 288 F.2d at 871.

Judge Burger compared his formula as being one in essentially the same terms as that of the Report of the Royal Commission on Capital Punishment. Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853, 871 n. 33. We agree with the statement in Blocker that neither of these tests possesses the infallibility of Holy Writ. Per contra each seems to avoid the fundamental defects which bring the other tests into the forum of criticism. Both are not too far from the

2. "The instruction given by the trial court, quoted in note 7, contains three tests of insanity, any one of which, if met under the facts of this case, would require acquittal. For purposes of discussion, these tests will be referred to as: (1) the 'right-wrong' test; (2) the 'nature of the act' test; and (3) the 'uncontrollable act' test. This instruction follows, in substance the three-test instruction allowed by the Supreme Court in Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750, and approved by this court in Andersen v. United States, 9 Cir., 237 F.2d 118, 127–128." Maxwell v. United States, 368 F.2d 735, 741–742 (9th Cir. 1966).

modified M'Naghten test in use in this circuit. All have the basic virtue of being propounded in simple terms easily understood by an average layman.

## THE AMERICAN LAW INSTITUTE TEST

The ALI test closely approximates the test in use in this circuit, Maxwell v. United States, 368 F.2d 735, and Sauer v. United States, 241 F.2d 640, and the alternate suggestions made here, except for one glaring word. That word is "substantial". Otherwise, the ALI test appears to contain the basic ingredients common to all formulations. The explanation given by the Institute for the use of this modifier is as follows:

> "In addressing itself to impairment of the cognitive capacity, *M'Naghten* demands that impairment be complete; the actor must *not* know. So, too, the irresistible impulse criterion presupposes a complete impairment of capacity for self-control. The extremity of these conceptions is, we think the point that poses largest difficulty to psychiatrists when called upon to aid in their administration. The schizophrenic, for example, is disoriented from reality; the disorientation is extreme; but it is rarely total. Most psychotics will respond to a command of someone in authority within the mental hospital; they thus have some capacity to conform to a norm. But this is very different from the question whether they have the capacity to conform to requirements that are not thus immediately symbolized by an attendant or policeman at the elbow. Nothing makes the inquiry into responsibility more unreal for the psychiatrist than limitation of the issue to some ultimate extreme of total incapacity, when clinical experience reveals only a graded scale with marks along the way." *Comments*, Model Penal Code, Tent. Draft No. 4, p. 158 (1955).

Since the definition the courts are called upon to pronounce is a legal defini-

tion, the necessity to becloud it as a palliative to the psychiatrists seems unnecessary. The modifying word creates more problems than it solves. The explanation is so mystical that it approaches the supernatural. It is difficult to believe that the definitions as proposed in *Maxwell*, *Blocker* and by the Royal Commission raise the hobgoblin which the psychiatrists imagine. The difficulty is that the word goes too far and may well have an impact beyond that intended. How is the jury to know what "substantial" means? How does anyone know except the user? It gives the definition an unreal Alice in Wonderland touch in an area of the law where that is the last thing in the world that is needed. The jury could believe that a twenty-five percent lack of capacity is "substantial" and acquit one who is otherwise morally responsible. "An accused may have a mental disorder or deficiency and in some cases still be mentally competent to be held legally responsible for his crime." Mims v. United States, 375 F.2d 135, 142 (5th Cir. 1967).

The word "substantial" is a worm in the apple. It is to be noted that (1) the M'Naghten test (Ninth Circuit) does not use the word "substantial"; (2) the British Royal Commission test does not use the word "substantial"; (3) Judge Burger's test does not use the word "substantial"; and (4) the American Law Institute uses it only in connection with the protective sections providing for detention and treatment constituting the remaining portion of the entire article on "Responsibility". *See infra.* I am not persuaded that its use by the majority here can cause other than serious mischief.

Another serious objection to the use of the words is that it necessarily enlarges the category of persons who may win acquittals because they are "substantially" (whatever that means) lacking in capacity. The ALI committee and the reporter and consultants recognized this effect.[3] But they provided the safe-

3. "The law must recognize that when there is no black and white it must con-

tent itself with different shades of gray. The draft, accordingly, does not demand

guards. That is what the majority here does not do. That is the dominant reason for this dissent.

The American Law Institute group which propounded the definition under consideration is a distinguished group who have performed a great public service in an intricate and complicated area of the law. The task they performed went far beyond formalizing a test for insanity. They proposed a codification of a section of the criminal law on "Responsibility".[4] Their codification of "Responsibility" consists of ten sections, of which 4.01(1) is only an integral, albeit an important, part. The other sections however are just as vital and one simply cannot lift out of the article this particular section without doing violence to the entire plan. The other sections pertinent here are (in substance) as follows:

4.03(1) Mental disease or defect is an Affirmative Defense, (2) Notice of the defense must be given; (3) When defendant is acquitted on ground of mental disease or defect, verdict and judgment shall so state.

4.05 Psychiatric examination by court-appointed psychiatrist.

4.08(1) When defendant is acquitted on ground of mental disease or defect excluding responsibility, *the court shall order him placed in an appropriate institution for custody and treatment.*

(2) Provision is made for hearing and release if no longer dangerous to himself or to others.

It is apparent from the sections paraphrased that the Criminal Law Committee did not stop when it had liberalized the definition of insanity. This was only part of the coverage of the Article on "Responsibility". It recognized also that custody and treatment were imperative.[5]

The majority here propose to adopt the liberalized insanity test out of the section on "Responsibility" without incorporation of the limitations or safeguards. In their anxiety to join with their brother circuits they open the throttle to full speed ahead without ever checking the brakes. In the District Courts of the United States when an insanity defense is sustained and a "not guilty" verdict is returned, that person may walk out of the courtroom a free man. By hypothesis he is a person with a mental defect or disease which caused him to commit that crime. He is a dangerous person. There may be differences of opinion as to how many more acquittals will result from the adulteration of the standard by the use of the word "substantial" out of context with the whole plan. One cannot poll a jury after the fact and obtain any reliable information by inquiring whether application of a different standard would

---

complete impairment of capacity. It asks instead for *substantial* impairment." (Emphasis in original.)
*Comments*, Model Penal Code, Tentative Draft No. 4, p. 158.
"I have tried to state the principle that makes it just to exculpate from condemnatory-punitive judgment and sanction persons who are seriously afflicted by disease. I have tried to state that principle *more leniently than M'Naghten* or irresistible impulse, or even New Hampshire, as the test is interpreted in that state. By relaxing the rigor of the criterion somewhat, I have tried to make it easier for the psychiatrist to give his evidence and to enlarge the cases in which a conscientious man would feel that he could give a meaningful opinion." (Emphasis added.)
*Comments*, Model Penal Code, Tentative Draft No. 4, p. 191. (Wechsler [report-

er] to Guttmacher [consulting psychiatrist])

4. *See* American Law Institute, Model Penal Code, Proposed Official Draft, May 4, 1962.

5. In its comments on Section 4.08, the committee said:
"The provision for automatic commitment is in accordance with the practice in England and a minority of American jurisdictions. It not only provides the public with the maximum immediate protection, but may also work to the advantage of mentally diseased or defective defendants by making the defense of irresponsibility more acceptable to the public and to the jury."
*Comments*, Model Penal Code, Tentative Draft No. 4, p. 199.

have made any difference in the verdict. Jurors, humanly, believe their verdict was correct and doubtless would say it would not have been changed by so subtle a modification. That is quite different, however, from having the modifier in the definition in the beginning and the testimony, expert opinion, instruction and argument based upon it.

The only statistical information has been compiled with reference to the Durham test in the District of Columbia. *See* Durham v. United States, 94 U.S. App.D.C. 228, 214 F.2d 862 (1954). The Durham test did not go so far as to use the word "substantial" but it did eliminate the "absolute" criterion of M'Naghten and thus broaden the test to some extent. Congress became so concerned with the possible consequences of this liberalization that it enacted a statute directing commitment to a mental hospital for detention and treatment of any criminal defendant who was acquitted on the ground he was mentally irresponsible.[6] Unfortunately, no such statute is in existence in this or any other circuit to apply to acquittals in federal courts. The statistical survey disclosed, as expected, a marked increase in the number of acquittals.[7] A similar if not greater increase seems inevitable under the decision of the majority.

The increase in the number of acquittals based upon 1960 statistical information is necessarily related to overall statistical information on the number of crimes committed. That information is not reassuring.[8]

---

6. § 24–301(d), District of Columbia Code. Mr. Justice Clark dissenting in Lynch v. Overholser, 369 U.S. 705, 721, 82 S.Ct. 1063, 1073, 8 L.Ed.2d 211 (1961), stated:

   "The statute, in my view, is not only designed to protect the public from the criminally incompetent but at the same time has the humanitarian purpose of affording hospitalization for those in need of treatment. It is, therefore, of the utmost importance to this community."

7. From statistical information obtained from the records of the U. S. District Court for the District of Columbia, St. Elizabeth's Hospital, and the Police Department of the District of Columbia it was found in 1960 that:

   "[T]he Durham rule has brought a significant increase in the acquittals by reason of insanity. * * * In the four years prior to the decision, there were 13 such acquittals in the District Court, the District of Columbia's primary trial court. In the five years since, there have been 78, 30 of them in the year ending June 30, 1959."

   James Clayton, *Six Years After Durham*, I. Am. Jud. Soc'y, June, 1960, p. 19. The same author points out at p. 20:

   "More murderers have been acquitted under the rule than other offenders with robbers and housebreakers running a close second."

8. "Between 1960 and 1968, the national rate of criminal homicide per 100,000 population increased 36 percent, the rate of forcible rape 65 percent, of aggravated assault 67 percent, and of robbery 119 percent. These figures are from the *Uniform Crime Reports* published by the Federal Bureau of Investigation. These Reports are the only national indicators we have of crime in America. But, as the FBI recognizes, they must be used with caution.

   "There is a large gap between the reported rates and the true rates. In 1967 the President's Commission on Law Enforcement and Administration of Justice stated that the true rate of total major violent crime was roughly twice as high as the reported rate."

   Report of National Commission on the Causes and Prevention of Violence, Dr. Milton S. Eisenhower, Chairman (November, 1969), pp. 1–2.

   "Any evaluation of law enforcement in the sixties would be meaningless without at least a cursory look at the crime picture for that period. During 1960, there were 2,014,600 serious crimes reported. While complete statistics for 1969 are not yet available, preliminary reports show that crime rose 9 percent during the first 6 months when compared with the first half of 1968. Almost 4.5 million serious crimes were recorded in 1968.

   "Thus, the volume of crime has soared 122 percent since 1960 while population has risen 11 percent. Also, since 1960 the risk of being a victim of a serious crime has nearly doubled. Indeed, crime has become such a heavy burden on our society that many authorities believe it to be the nation's most serious internal problem."

   F.B.I. Law Enforcement Bulletin, December 1969, p. 1.

Don Wade robbed a bank. He used a gun. One of the questions framed for the psychiatrist was as follows:

"Q. Doctor, have you formed an opinion as to whether or not as the result of his mental disease or defect Don Wade lacked substantial capacity to conform his conduct to the requirements of the law at the time he was in the bank on November 23, 1966?

"A. Yes.

"Q. What is that opinion?

"A. I don't think he was able to do that for probably several weeks before he was in the bank, including that period and certainly on the day that I saw him."

On the basis of the ALI test to be applied by the majority Don Wade may well walk away from the courtroom a free man. The district judge has no legal means of guaranteeing that he will be detained for examination and treatment. What happens when he next suffers from a "psychotic depression" and his hand gun is ready?[9]

It is not inappropriate to consider the policy arguments urged herein. Indeed, the circuits have done so but with faint praise. The protection of the public is an important if not vital consideration in the administration of the criminal law, and if substantive rules and standards are to be changed by judicial fiat, the changes proposed should receive careful consideration as to their effect on the public. Neither the majority in this decision, nor the majorities in most of the other circuits have done so. To be specific: In Ramer v. United States, 390

F.2d 564, 577 (9th Cir. 1968), cert. denied, 393 U.S. 870, 89 S.Ct. 156, 21 L.Ed. 2d 138 (1968), a dissenting opinion advocated the ALI test and mentioned the policy argument against liberalization until Congress provided for detention and rehabilitation. Only one terse paragraph of the dissent was devoted to the problem which was dismissed as an irrelevant sociological consideration relying by citation upon the opinion in United States v. Shapiro, 383 F.2d 680, 686 (7th Cir. 1967). A reference to that case, however, shows that *Shapiro* likewise looks the other way by mentioning the problem and then saying:

"We agree that there is an undesirable gap in procedure for solving the problem when it arises, which it must under any definition of the defense of insanity, but we do not deem the existence of the gap a sufficient reason for rejecting the ALI definition."

That opinion in turn cites United States v. Freeman, 357 F.2d 606, 625–626, (2d Cir. 1966), and United States v. Currens, *supra*, 290 F.2d at 775–776, as authority supporting its statement. In *Freeman* the court recognized that as a result of its adoption of the liberalized rule, "effective procedures for institutionalization and treatment of the criminally irresponsible *are vital as an implementation to today's decision*". (Emphasis added). Then, with somewhat appalling irresponsibility on its own part the court expresses the hope that Congress will do something about detention and treatment, and that if Congress does not that the "criminally irresponsible promptly be *turned over* to state officials for commitment pursuant to *state procedures*". (Emphasis added) 357 F.2d at 626.[10]

9. For a "shocking instance in which the insanity plea was successfully invoked", *see* Sauer v. United States, 241 F.2d 640, 648 n. 21 (9th Cir. 1957), cert. denied, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed. 1539 (1957). For another, *see* Tydings, *A Federal Verdict of Not Guilty By Reason of Insanity and a Subsequent Commitment Procedure*, 27 Md.L.Rev. 131, 132 (1967).

10. Commenting on reliance upon the states to solve the federal problem, Senator Tydings states:
"A system of federal justice that relies on such fortuitous circumstances to protect society and assure that persons suffering from mental diseases receive adequate care can hardly be worthy of great public esteem. The federal judicial system cannot continue to rely on

*Currens* offers the same fanciful and barren answer:

"In any event, should Currens be acquitted at his new trial, the federal authorities should bring him and his condition *to the attention of the state authorities* to the end that he may not remain in a position in which he may be a danger to himself or to the public." (Emphasis added). 290 F.2d at 776.[11]

Obviously state procedures for commitment of criminally insane were enacted for state prosecutions and not federal; there is no prompt procedure for transfer of the federal criminal insane to state custodial authorities; there is no uniformity among states for the processing of the criminally insane,[12] and with the notoriously overcrowded conditions in state institutions there is no assurance that the state would or should assume the federal responsibility.

The only court in the federal system which has really come to grips with the problem is the Ninth Circuit in Sauer v. United States, 241 F.2d 640 (9th Cir. 1957), cert. denied, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957). Although the court was there considering the alternative Durham rule, the principle involved is the same in the case now before us. Judge Barnes stated:

"But there is another, and possibly the most significant reason, why this court must refuse to modify existing law. Most observers implicitly assume in their criticism of present law that if the accused is set free on the criminal side that he will be confined on the civil. Unfortunately, that is not the case. If it were, this court might be much more disposed to alter its current views. *The choice today in this jurisdiction is not between confinement and commitment, but rather between confinement and freedom.*" 241 F.2d at 650. (Emphasis added).

The choice has not changed with the passage of time. If this argument was significant in 1957, it should be compelling in 1970.

Mr. Justice Clark makes the point clearly in his dissent in Lynch v. Overholser, supra:

" * * * insane offenders are no less a menace to society for being held irresponsible, and reluctance to impose blame on such individuals does not require their release. The community has an interest in protecting the public from antisocial acts whether committed by sane or insane persons. We have

fortune to solve the problems posed by a person being found not guilty of federal criminal charges after the introduction of insanity evidence. The gap presently existing in federal criminal procedure must be closed."

Joseph D. Tydings, *A Federal Verdict of Not Guilty By Reason of Insanity and a Subsequent Commitment Procedure,* 27 Md.L.Rev. 131, 135 (1967).

11. As Judge Hastie noted in dissent in *Currens,* the Court had no authority to order commitment:

"[I]t is doubtful whether the federal authorities could require the restraint and psychiatric treatment of the appellant if he should be retried and, by reason of his mental illness, found not guilty. I think we need not and, therefore, should not thus risk the release of one found to be a criminal psychopath when restraint and treatment seem desirable both medically and socially." 290 F.2d at 777.

12. As stated by Mr. Justice Clark in his dissent in Lynch v. Overholser, 369 U.S. 705, 725–727, 82 S.Ct. 1063, 1075, 8 L.Ed. 2d 211:

"At the present time [May, 1962] statutes provide for mandatory commitment of persons acquitted by reason of insanity in 12 States and the Virgin Islands as well as in England and the District of Columbia. Six States permit commitment if the trial judge. Eighteen more provide for mandatory or discretionary commitment if the trial judge finds that the defendant's insanity continues or that his discharge would be dangerous to the public peace. In 10 States and in Puerto Rico, mandatory commitment follows a like finding by the trial jury or by a second jury. In three States standards for civil commitment must be met."

long recognized that persons who because of mental illness are dangerous to themselves or to others may be restrained against their will in the interest of public safety and to seek their rehabilitation, * * *" 369 U.S. at 724, 82 S.Ct. at 1074, 8 L.Ed.2d 211.

Judge Brosman also correctly assessed the problem in United States v. Smith, 5 U.S.C.M.A. 314, 322, when he said:

> "The authority to determine who shall be committed as insane should in practice be linked with the determination of who shall be acquitted as mentally irresponsible—since in the ordinary case, a person properly acquitted by reason of insanity requires treatment in a mental institution. Yet, unless commitment procedures are integrated with the administration of criminal law, there is more than a fair risk that an accused may avoid both the jail and the asylum."

## STATE OF THE AUTHORITIES

The majority opinion takes a quick look at the circuits and concludes that with respect to the authorities, "we should no longer stand virtually alone," and at another place points to "almost universal abandonment of the M'Naghten-irresistible impulse test." It is true that in the circuits little has been written of the considerations which should lead to a retention of M'Naghten. Having served the administration of criminal justice for as long as it has, it deserves better treatment. On its record alone it would appear that it cannot be all bad. M'Naghten, however, has not been deserted.

One might be led to believe from a reading of some of the federal decisions cited by the majority that because of disaffection among psychiatrists, the ALI test is the only one in favor among them. The majority also refers to "wide-spread criticism of the [M'Naghten] test by prestigious bar and medical groups, medical-legal scholars and state courts

* * *." Such sweeping declarations suggest a closer examination of the authorities.

Dr. Overholser,[13] writing in the American Bar Association Journal in 1962 endorsed Durham and assessed ALI as follows:

> "I have indicated already that I have some reservations, to put it mildly, concerning the American Law Institute formulation of criminal irresponsibility. The formulation appears to me to be a combination of the M'Naghten rule ('capacity to appreciate the criminality') and the irresistible impulse test ('conform his conduct to the requirements of law'). This formulation met the approval of the majority and has been adopted by the Institute; it is a fact, however, that all three of the psychiatric consultants on the committee take exception to it." 48 A.B.A.J. 527, 529 (1962).

A professor of Clinical Psychology at the University of Minnesota, Paul E. Meehl, teamed with a member of the law faculty, Joseph M. Livermore, in making a searching analysis of the several tests for insanity including the ALI test and concludes:

> "While more refined formulations may be possible, it is our contention that the 124-year-old *M'Naghten* rule with its focus on cognitive impairment is sounder from the standpoints of the purposes of the criminal law, of present psychiatric knowledge, and of ease of judicial administration than any of the newer tests." Livermore and Meehl, *The Virtues of M'Naghten*, 51 Minn. L. Rev. 789, 856 (1967).

*See also* Mueller, *M'Naghten Remains Irreplaceable: Recent Events in the Law of Incapacity*, 50 Geo.L.J. 105 (1961).

There is no doubt, however, that many psychiatrists are unhappy with M'Naghten. They are also unhappy with other tests, including the ALI test, and

---

13. Dr. Winfred Overholser, Sup't. St. Elizabeth's Hospital, Washington, D. C.; Professor Emeritus of Psychiatry at George Washington University School of Medicine; President, American Psychiatric Association 1947–1948.

seem most pleased with Durham.[14] What appears to displease them most of all is the legal system with its method of developing evidence by artful cross-examination.[15]

Legal scholars and the courts are also divided but there is not the "almost universal abandonment of the M'Naghten-irresistible impulse test" that has been suggested by the majority. In the nine state jurisdictions constituting the geographical boundaries of the Ninth Circuit, all but Idaho adhere to M'Naghten.[16] In the Comments to the Model Penal Code of the American Law Institute (Tentative Draft No. 4, April 25, 1955) at p. 161, 30 states are shown to have adopted the right-wrong test and 14 others, the right-wrong plus irresistible impulse. In the British Commonwealth the test is stated to be either M'Naghten or M'Naghten plus irresistible impulse (p. 162). The Supreme Court of the United States has approved M'Naghten. Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897).

There have been some changes of recent date. Idaho has adopted the ALI test. State v. White, 93 Idaho 153, 456 P.2d 797 (1969). Iowa re-examined the authorities and has supported M'Naghten in State v. Harkness, 160 N.W.2d 324 (Iowa 1968). Pennsylvania has adhered

to the M'Naghten test in Commonwealth v. Rightnour, 435 Pa. 104, 253 A.2d 644 (1969) as has Arizona in State v. Malumphy, 105 Ariz. 200, 461 P.2d 677 (1969). Enough has been said to establish that M'Naghten has not received "almost universal abandonment". On the contrary it appears to be by far the prevailing rule among states. It is in the state jurisdictions where the rule would be expected to have its most frequent application, and its severest test.

The majority in its concluding paragraphs on this subject recognizes "as paramount" the interest of the public to be protected from dangerous individuals. It points to the lack of any protection in our present federal system from the threat to society and to the individual of the unconditional release of the criminally insane who have successfully asserted this defense. It recognizes the need for something to be done. Then the majority hastily, almost apologetically, states that "we cannot abdicate our judicial responsibility" by continuing the antiquated M'Naghten rule merely because legislation on collateral matters is still pending—in other words, merely because nothing has been done to protect the public from the liberalized definition. I find such a statement completely unconvincing. The majority points to no break-

14. Philip Q. Roche, M.D. Assistant Prof. Psychiatry, University of Pennsylvania; Manfred S. Guttmacher, M.D. Chief Medical Officer, Supreme Bench, Baltimore Md. and Psychiatric consultant Am. Law Institute; Gregory Zilborg, M.D. practicing psychiatrist, author, lecturer, all writing in Symposium, Insanity and the Criminal Law—A Critique of Durham v. United States, 22 U.Chi.L.Rev. 317 (1955).

15. Dr. Guttmacher, Comments, ALI Model Penal Code, Tenative Draft No. 4, p. 179–180.

16. Alaska: Chase v. State, 369 P.2d 997 (Alaska 1962);
Arizona: State v. Malumphy, 105 Ariz. 200, 461 P.2d 677 (1969);
California: People v. Quicke, 61 Cal.2d 155, 37 Cal.Rptr. 617, 390 P.2d 393 (1964) (Opinion by Traynor, Chief Justice);

Hawaii: State v. Moeller, 50 Haw. 110, 433 P.2d 136 (1967). Mc'Naghten criticized but adhered to as statutory;
Idaho: State v. White, 93 Idaho 153, 456 P.2d 797 (1969). (Adopts ALI test);
Montana: State v. Noble, 142 Mont. 284, 384 P.2d 504 (1963);
Nevada: Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965); cert. denied, 384 U.S. 1012, 86 S.Ct. 1932, 16 L.Ed.2d 1030 (1966); See also Williams v. State, 451 P.2d 848, 851 (Nev. 1969);
Oregon: State v. Gilmore, 242 Or. 463, 410 P.2d 240 (1966);
Washington: State v. White, 60 Wash.2d 551, 374 P.2d 942 (1962); cert. denied, 375 U.S. 883, 84 S.Ct. 154, 11 L.Ed.2d 113 (1963); City of Seattle v. Hill, 72 Wash.2d 786, 435 P.2d 692 (1967), cert. denied, 393 U.S. 872, 89 S.Ct. 163, 21 L.Ed.2d 142 (1968).

down in the administration of the criminal law which might be caused by continuing with M'Naghten or a more restrictive version of the ALI test.[17] The only effect is that more criminally insane will be in penal institutions and not so many on the streets.[18] The change is not dictated by any decision of the Supreme Court, by any statute or any constitutional provision or doctrine. As Mr. Justice Clark once said:

"One is reminded of the exclamation of Pyrrhus: 'One more such victory * * *, and we are utterly undone.'" Fay v. Noia, 372 U.S. 391, 447, 83 S.Ct. 822, 853, 9 L.Ed.2d 837 (1962).

For these reasons I respectfully dissent.

BARNES, Circuit Judge, dissenting from the majority opinion and concurring in Circuit Judge TRASK'S dissenting opinion:

"The divergence between law and psychiatry is caused in part by the legal fiction represented by the words 'insanity' or 'insane,' which are a kind of lawyers catchall and have no clinical meaning. * * * The legal definition of insanity is almost impossible to come upon." Biggs, John Jr., "The Guilty Mind," p. 117.[1]

"Bovier's Law Dictionary, Rawles 3d Edition, states bluntly the legal and the medical ideas of insanity are essentially different, and the difference is one of substance." Id.

That which outstanding representatives of both the legal and medical professions confess they cannot do, the law requires a jury to do. For this reason, if no other exists, the judiciary should move slowly and most carefully in redefining terms which it subsequently requires lay juries to comprehend and utilize in determining the innocence or guilt of a defendant. This process of redefinition usually is thought to involve matters of policy reserved for legislative bodies to determine.

17. In Commonwealth v. Rightnour, 435 Pa. 104 at 253 A.2d 644 at 650 (1969), the Supreme Court of Pennsylvania quoting, with approval from another case, said: "In Commonwealth v. Woodhouse, 401 Pa. 242, 164 A.2d 98, *supra*, a defendant was convicted of murdering his sixteen-year-old adopted daughter and the jury fixed the penalty at life imprisonment. While the defense was insanity, the Court reviewed many different psychiatric tests which had been advanced over the years and rejected them, and once again reaffirmed the M'Naghten Rule." With respect to the M'Naghten Rule, the Court pertinently said (pages 258–259, 164 A.2d page 107: "Until some rule, other than 'M'Naghten,' based on the firm foundation in scientific fact for effective operation in the protection and security of society, is forthcoming, we shall adhere to it. We shall not blindly follow the the opinion of psychiatric and medical experts and substitute for a legal principle which has proven durable and practicable for decades, *vague rules that provide no positive standards*." (Emphasis in original.)

18. At least under the M'Naghten rule, if convicted, the defendant is removed from society for a period of time during which the public is free of the risk of his fur-

ther aberrations. Moreover, during his incarceration, he will be permitted or required to submit to whatever minimal examination and treatment is available if he is "substantially" insane. 18 U.S.C. § 4241 provides for examination by a board, of prisoners alleged to be mentally defective or of unsound mind. The Attorney-General on the basis of the report may order such prisoner to be removed to the United States hospital for defective delinquents until restored to sanity or health or until sentence served.

1. "Insanity is a purely legal term which has to be defined legally by the court in which it is used according to the law prevailing in that court. In medicine the term *insanity* has no meaning. There is no disease called insanity." Werthem, "*The Show of Violence*," 1949, p. 15 and p. 86.
"'Insanity' * * * is a word which has no clear medical, nor I believe, legal meaning * * *. In what circumstances mental illness should mitigate criminal responsibility * * * is a question, not for lawyers or doctors, but for society to decide." Quotation from a letter by W. Russell Brain, M.D., President Royal College of Surgeons (1952) quoted in Zilborg's "*The Psychology of the Criminal Act and Punishment*." pp. 18 and 19.

Change merely for the sake of change merits no adulation from judges. Our goal should be to seek practical solutions to vexing medico-legal problems, not to search for some, or *any*, change. That one opposes any change, or a particular change, does not mean one is satisfied with present definitions. This court so expressed itself in Sauer v. United States, 241 F.2d 640, 644–645 (1957).

The majority opinion correctly states that since our *Sauer* opinion, the so-called M'Naghten rule has been rejected by all circuits but the First and Ninth.

Yet there has been no unanimity of opinion as to which one of various new definitions is the best. Durham, 94 U.S. App.D.C. 228, 214 F.2d 862 (1954) was originally urged as the ultimate solution, yet it is no longer unmodified even in its own circuit—and the same psychiatrists who once applauded it now denigrate it.

And the A.L.I. Reporters (Professors Herbert Wechsler, Louis B. Schwartz and Paul W. Tappan) in their comments, expressly repudiate the *Durham* decision.

Judge Trask's dissenting opinion points out that the most significant and material difference between our present standard (*Sauer* plus *Maxwell*) [2] and the proposed A.L.I. standard, is the one word "substantial." I agree with Judge Trask that such a "standard" would permit psychiatrists a wide latitude to go anywhere in their expert opinions. This is what some psychiatrists desire, but is it what the courts want, or need?

One fundamental objection I have to the majority opinion is that which Judge Trask states is "the dominant reason" for his dissent, namely—but a *portion* of the A.L.I. recommended article on "Responsibility" is proposed to be adopted. Sec. 4.01(1) is adopted, but Sec. 4.01(2) is rejected. The latter is the attempt by the A.L.I. to exclude "psychopathic personalities,"[3] and its omission is not met in any way—other than to say this second paragraph "fails to achieve its purpose and fails to establish any meaningful test."

Even though there exists a "great dispute over the psychiatric soundness of Section 4.01(2)" that seems to me as much a reason to adopt it, as to reject it, and certainly is no reason to disregard it entirely.

The most serious defect of this court's proposed solution to the difficult problem before us is the lip-service paid to

"[the] paramount * * * interest of the public to be protected from dangerous individuals. It is imperative that a mentally deranged offender acquitted because of insanity be immediately subject to a procedure to determine the necessity of compulsory hospitalization for as· long as he remains a menace."

Having so stated "the immediate imperative," the majority opinion points out that no such result can now be expected, nor is it presently possible to know when it can be. It must await congressional action.

Such rejection of "the immediate imperative" because "legislation on collateral matters is still pending" is a contradiction in terms, and a poor reason for immediate change.

The choice given to this court and this circuit's juries, today, as it was in 1957 when *Sauer, supra,* was written, is not "between confinement and commitment but rather between confinement and freedom," when passing upon a defendant's claimed insanity.

The A.L.I. recognized that the definition it advocates requires certain safeguards. (4.03(1) and 4.08(1).) The majority opinion, in adopting but a por-

2. 368 F.2d 735 (9th Cir. 1966).

3. John Biggs, Jr., *"The Guilty Mind,"* p. 160.

tion of the A.L.I. standards, does not recognize this requirement.

For these reasons, I respectfully dissent.

CHAMBERS, Circuit Judge, dissenting:

If we were going to see a psychiatrist, I am sure he would not let us bring our own couches along. When the psychiatrists come over to see us officially and testify, there is no valid reason I can see that they should not do business on our terms, to wit: the M'Naghten rule. And, there have usually been enough of them willing to use it. But now we bend our knee to them.

We live in a time when any change is presumed to be good. But all change is not good. Here it is not contended that if we use the A.L.I. rule some will be convicted who have not hitherto been convicted and that others will go free. And, it is not contended that exactly the same people will be convicted or that more will be convicted. The only possible consequence is that a lesser number will be convicted. Probably only a few will go free because of the change we now make. But those few, almost always associated with violent crimes, we shall put out on the streets, already unsafe enough. This is no time in American history to join this parade of psychedelic logic.

If Mr. Wade, the bank robber, is to be tested by less than M'Naghten, I would let the Congress require it.

KILKENNY, Circuit Judge, with whom JAMES M. CARTER, Circuit Judge, joins, dissenting:

While I do not believe there is a valid, logical or worthwhile distinction between the ALI Rule, so eloquently proposed by the majority, and the M'Naghten Rule, so ably defended by the minority, I cannot subscribe to even limited retroactivity as proposed by the majority. We should not change the rules after the game is over. To require new trials in cases already decided, merely to give status to a previously unacceptable rule is, as I see it, going far beyond a permissible judicial function.