**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Sterling Brooks HUNT, a/k/a James Booker Reed, Defendant-Appellant.**

**No. 73–1012.**

United States Court of Appeals,
Ninth Circuit.

May 16, 1973.

James F. Hewitt, Federal Public Defender, William A. Brockett, Asst. Federal Public Defender, San Francisco, Cal., for defendant-appellant.

James L. Browning, Jr., U. S. Atty., F. .Steele Langford, Michael W. Field, Asst. U. S. Attys., San Francisco, Cal., for plaintiff-appellee.

Before DUNIWAY and WRIGHT, Circuit Judges, and SMITH,* District Judge.

## OPINION

RUSSELL E. SMITH, District Judge:

Here and below defendant conceded that he committed an armed bank robbery. The only defense was insanity. The government's case-in-chief was devoted to the proof of the robbery. In his case defendant called a clinical psychologist who testified that defendant lacked capacity to commit crime under the test established by Wade v. United States, 426 F.2d 64 (9th Cir. 1970). In rebuttal the government called Dr. Rapaport, a psychiatrist, who testified to the contrary.

Dr. Rapaport had been appointed at defendant's request to make an examination as to competency to stand trial under 18 U.S.C. § 4244. In the early stages of the trial defendant moved to exclude the testimony of Dr. Rapaport for the reason that he was appointed only to determine defendant's competency to stand trial. In United States v.

Mattson, 469 F.2d 1234 (9th Cir. 1972) this court said:

. . . Rather, this case is within the general rule that a psychiatrist appointed to make a § 4244 examination may give his opinion of the sanity of the accused at the time of the alleged offense.

*Mattson* establishes the law in this circuit. United States v. Malcolm, 475 F.2d 420 (9th Cir. 1973). The facts in *Mattson* differ from the facts here in that the order in *Mattson* did appoint the doctor for both purposes although neither defendant nor his lawyer was aware of the fact that the order did include directions to examine for capacity to commit crime. This fact difference is not in our opinion sufficient to distinguish *Mattson*. The facts in United States v. Driscoll, 399 F.2d 135 (2nd Cir. 1968) were identical to the facts here in that the order appointing was limited to a Section 4244 examination. In *Driscoll* the court reversed the conviction on the grounds asserted here but this court in *Mattson* accepted the views presented in the dissent in *Driscoll*. *See* United States v. Malcolm, *supra.*

We note a problem raised by United States v. Malcolm, *supra*. In that case (decided after this case was tried) the court said that the restrictive language of Section 4244,

. . . No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceedings . . .,

applies to an examination made for the purpose of determining the capacity to commit crime and also that the words "on the issue of guilt" relate not only to the facts constituting the crime but also to mental state of the defendant.

* The Honorable Russell E. Smith, Chief Judge of the United States District Court for the District of Montana, sitting by designation.

In this case Dr. Rapaport did testify as to statements made to him by the accused. The error was harmless in view of the record in this case. The testimony of Dr. Rapaport as to defendant's statements is set out in Appendix A. Defendant's admission of the crime normally would be damaging, as would be the statements that defendant knew it was wrong to rob a bank, but the psychologist called by the defendant had previously said the same things. On cross-examination defendant elicited similar statements from Dr. Rapaport. The remainder of the statements attributed to defendant on direct examination tended to confirm the thesis of defendant's witness, i. e., that defendant felt pressures and that the crime was a reaction to them.

The contention that the defendant's cross-examination of Dr. Rapaport was unduly limited is without merit.

The judgment is affirmed.

## Appendix A

*Direct Examination*

I questioned him regarding the offense. He told me about it in detail He knew—he told me he knew, and I was of the opinion that he did know, that it was wrongful and unlawful and punishable to commit the offense of bank robbery and he was conscious of what he was doing and conscious of the fact that it was against the law. That is, the law as is set up by the states and the Federal Government.

He—he told me that since an experience which he had some few years ago, he had a lot of time to think and he felt he had developed some very pronounced ideas concerning treatment of human beings by human beings and of a racist quality, so I asked him, in particular, whether he meant that it was the whites against the blacks. He said no, he says, "You know, there are black racists too, and where I came from, most of my association was with blacks and I found that they also were intolerant and prejudiced, but then California was more."

He came here shortly before his arrest. He said here he always found the same situation between the whites and the blacks and that he felt, in his own mind, his reasoning, that he had to do something even though he knew it was wrong in order to get even with the element which were (sic) abusive.

\*    \*    \*    \*    \*    \*

*Cross-Examination*

Q. Did Mr. Hunt appear to be repelled by or horrified at his actions in holding up the bank?

A. No, he—he had done it, he knew it was wrong and expected what was going to happen, right or wrong. He knew what could happen and he didn't believe he was being framed or that there was any organization or group that forced him into this position in order to get him out of the way. He made a mistake, that's all.

Q. Did he indicate to you that he was resolved to not repeat this kind of mistake?

A. Would he repeat it?

Q. Yes.

A. He indicated to me that he would not. He would now—what he wants to do now is, whenever it's possible, is return to school and improve his general life situation and be back with his family, and I think it's in Illinois.